UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| TAEWOO KIM, KASHYAP PATEL, KERRY WOOLLEY, and KEN WORSHAM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) |
| JUMP TRADING, LLC, JUMP CRYPTO HOLDINGS, LLC (f/k/a 1HOLD1 LLC), KANAV KARIYA, and WILLIAM DISOMMA, | ) ) ) ) ) |
| Defendants. | ) ) |

Case No. 1:23-cv-02921

Honorable Joan H. Lefkow

<u>CLASS ACTION</u>

<u>DEMAND FOR JURY TRIAL</u>

AMENDED COMPLAINT FOR VIOLATIONS OF THE COMMODITY EXCHANGE ACT, CFTC REGULATIONS, AND COMMON LAW UNJUST ENRICHMENT

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

PARTIES ................................................................................................................................5

JURISDICTION AND VENUE ............................................................................................6

FACTUAL ALLEGATIONS .................................................................................................7

I.     Digital Assets and Crypto Commodities...................................................................7

       A.     The Blockchain and Foundations of Crypto Assets.....................................7

       B.     Crypto Commodities and Stablecoins...........................................................9

II.    The Terra Blockchain and Its Stablecoin, UST ......................................................11

       A.     Jump's Relationship with TFL and Sales of UST ......................................13

       B.     The Market for UST Was Efficient ............................................................18

       C.     Jump Manipulates the Market for UST and Artificially Inflates Its
              Price to Maintain the Appearance of a $1 Peg............................................19

       D.     Defendants' Cover-Up of UST's Instability and the May 2021
              Price Manipulation......................................................................................24

       E.     The Collapse of UST and the Terra Blockchain in May 2022 .................35

III.   Defendants Successfully Concealed Their Misconduct Through 2023 ...........................36

IV.    Plaintiffs Purchased UST During the Class Period and Suffered Damages ....................39

       A.     Individual Plaintiff Allegations..................................................................39

       B.     Allegations Concerning All Plaintiffs.........................................................42

CLASS ACTION ALLEGATIONS .....................................................................................43

CAUSES OF ACTION ........................................................................................................45

PRAYER FOR RELIEF ......................................................................................................57

DEMAND FOR JURY TRIAL ...........................................................................................58

Plaintiffs Taewoo Kim, Kashyap Patel, Kerry Woolley, and Ken Worsham (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, bring this class action against Defendants Jump Trading, LLC ("Jump Trading"), Jump Crypto Holdings, LLC (f/k/a 1Hold1 LLC) ("Jump Crypto," and together with Jump Trading, "Jump"), Kanav Kariya ("Kariya"), and William DiSomma ("DiSomma," and together with Jump Trading, Jump Crypto, and Kariya, "Defendants"). Plaintiffs' allegations are based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which investigation is continuing and has included, among other things, a review of the whitepaper of the digital assets at issue, press releases, media reports, sworn testimony, court filings, and other publicly disclosed reports and information about Defendants. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein, after a reasonable opportunity for discovery. Plaintiffs hereby allege as follows:

## INTRODUCTION

1.      This is a proposed class action on behalf of all persons who, during the period from May 23, 2021 through and including May 25, 2022, inclusive (the "Class Period"), purchased the digital asset UST in the United States and were damaged thereby (the "Class"). Defendants schemed with Do Kwon ("Kwon") and his company Terraform Labs Pte. Ltd. ("TFL") to manipulate the market price for UST and to conceal their manipulation, for their own benefit, which ultimately resulted in the destruction of billions of dollars' worth of UST held by members of the Class.

2.      In 2019, Kwon and TFL began selling UST and the related digital asset LUNA. Kwon and TFL purportedly intended for LUNA to function like other digital assets, such as Bitcoin, with a fluctuating value based on market conditions, the forces of supply and demand,

and its perceived value. UST, by contrast, would purportedly function as a so-called "stablecoin," with a price continuously pegged at $1, which was designed to appeal to the public as a safe crypto asset to serve as a store of value and medium of exchange. According to Kwon and TFL, UST's $1 peg would be automatically maintained through an algorithm permitting one UST token to be exchanged for $1 worth of LUNA, and vice versa, creating opportunities for arbitrage that would theoretically correct any deviation in UST's price from the $1 peg, all without the need for manual intervention.

3.     Defendant Jump Trading, through its self-described "cryptocurrency arm" Defendant Jump Crypto, was an early partner and primary financial backer of TFL. Between November 2019 and September 2020, Jump Crypto, through its wholly owned subsidiary Tai Mo Shan Limited, entered into a series of agreements with TFL and its affiliates to borrow tens of millions of LUNA tokens from TFL and to provide market-making services for transactions in LUNA and UST in exchange for the opportunity to purchase LUNA tokens at a steep discount, which could then be resold into the market to further profit Jump. Kwon told TFL's "leading investor group" that the deal reflected TFL's "partnership" with Jump Trading. As Defendant Kariya explained to Jump's leadership and staff, Jump's goal was an optical one: "to make UST *feel real*" so that more people would purchase UST. According to Kariya, increasing amounts of UST in circulation would increase the market value of LUNA and thus allow Jump to "monetize [its] position when the protocol is really running which is exactly what we want to do."

4.     In May 2021, TFL's purported algorithm failed to keep the price of UST pegged to $1, and the market price for UST began to plummet. Instead of publicly acknowledging the inability of TFL's algorithm to maintain UST's advertised peg price (which was fundamental to the perceived market value of UST and encouraged purchasers to continue to purchase these digital assets), TFL and Kwon secretly schemed with Defendants to manipulate and pump the market

price for UST by making secret, coordinated trades to prop up UST to its $1 peg. As part of the scheme, and at Defendant DiSomma's direction, Jump purchased more than *62 million* UST tokens between approximately May 23 and May 27, 2021—a significant portion of all UST trades during that period and more than enough to influence its price—causing UST's price to artificially inflate to $1 and causing a corresponding rise in the price of UST. Kwon later admitted to another TFL executive that, "if Jump hadn't stepped in" to restore UST's $1 peg, TFL "may have been fucked." Another TFL executive admitted that Jump had "saved our ass."

5.      To incentivize and reward Jump for its manipulation of the market for UST, Kwon agreed to modify TFL's prior agreements with Jump and instead unconditionally sell 65 million LUNA tokens to Jump at a greater than 99% discount from their then-current market price. Jump later resold those LUNA tokens into the market at a staggering profit of over *$1.28 billion*.

6.      Jump's direct manipulation of the market price of UST, and its aiding and abetting of TFL and Kwon's effort to manipulate the market for UST, violated the Commodity Exchange Act ("CEA"), which Defendants Jump Trading and Kariya do not dispute applies to UST.

7.      In addition, during the Class Period, Defendants actively concealed and aided and abetted TFL's and Kwon's concealment of Jump's May 2021 intervention to maintain the artificial $1 peg for UST. In addition to directly trading UST tokens, Jump also helped grow the market and purchaser base for UST through its "Wormhole" bridge protocol, which was adopted by TFL in August 2021 as the preferred mechanism for transferring UST between the Terra, Ethereum, Binance, and later Solana blockchains. But the artificial peg for UST could not be indefinitely maintained. By mid-May 2022, the price of UST had collapsed entirely, wiping out nearly *$19 billion* in UST holdings and bringing down the entire Terra blockchain. Some purchasers of UST lost their life savings. It has been reported that some even contemplated suicide.

- 3 -

8. As a direct and proximate result of Defendants' misconduct, Class members have sustained billions of dollars in actual damages under applicable law. Plaintiffs themselves experienced significant losses. Together, the four Plaintiffs lost over $2 million in UST.

9. Defendants' misconduct was not publicly revealed until months after the U.S. Securities and Exchange Commission ("SEC") filed a complaint against TFL and Kwon on February 16, 2023 in the Southern District of New York (the "SEC Complaint"). The SEC Complaint itself referred only to a "U.S. Trading Firm" that had colluded with TFL and Kwon to restore UST's artificial $1 peg. On December 28, 2023, however, the district court issued an opinion resolving cross-motions concerning summary judgment and certain evidentiary issues. That opinion was the first official confirmation of Jump's role in the artificial propping up of UST's $1 peg. The court's opinion also disclosed for the first time that two unnamed Jump executives had invoked their Fifth Amendment privilege against self-incrimination and refused to answer questions from the SEC in pre-trial depositions. The identities of those two executives— Defendants Kariya and DiSomma—were not revealed until March 28, 2024, when both men moved to quash trial subpoenas on the same Fifth Amendment grounds, among other reasons. The SEC agreed not to call either as a witness at trial, and the district court instructed the jury that they could draw an adverse inference that each man's testimony would have been unfavorable to TFL and Kwon. That jury ultimately found TFL and Kwon liable for fraudulently concealing Jump's role in restoring UST's $1 peg.

10. Federal prosecutors have also reportedly investigated Jump for market manipulation in connection with UST. And Kwon was arrested in Montenegro as a fugitive from justice and charged in the Southern District of New York with commodities fraud and other crimes. Like the SEC Complaint, the criminal indictment against Kwon alleges that, in May 2021, he "contacted representatives of a United States trading and investment firm ('Firm-1') to obtain their

assistance in altering the market price of UST," and "Firm-1 … deployed trading strategies designed to alter the market price of UST." Although the criminal case has not proceeded beyond the indictment, as Kwon has not been extradited to the United States, it appears that the unnamed firm referenced in Kwon's criminal indictment is Jump. Kwon also faces criminal charges in South Korea for violations of that country's capital-markets law. On August 1, 2024, an appeals court in Montenegro ruled that Kwon may not be extradited to the United States and must be extradited to South Korea to face justice.

11.    Plaintiffs bring this action to hold Defendants responsible for their misconduct in connection with the collapse of UST.

## PARTIES

12.    Plaintiff Taewoo Kim is a citizen of New Jersey and resides in Palisades Park, New Jersey. Plaintiff Kim purchased UST during the Class Period in the United States, and suffered losses as a result of Defendants' conduct.

13.    Plaintiff Kashyap Patel is a citizen of Texas and resides in Sugar Land, Texas. Plaintiff Patel purchased UST during the Class Period in the United States, and suffered losses as a result of Defendants' conduct.

14.    Plaintiff Kerry Woolley is a citizen of Minnesota and resides in Minneapolis, Minnesota. Plaintiff Woolley purchased UST during the Class Period in the United States, and suffered losses as a result of Defendants' conduct.

15.    Plaintiff Ken Worsham is a citizen of Tennessee and resides in Gray, Tennessee. Plaintiff Worsham purchased UST during the Class Period in the United States, and suffered losses as a result of Defendants' conduct.

16.    Defendant Jump Trading, LLC is a limited liability company incorporated in Delaware, with its principal place of business in Chicago, Illinois. Jump Trading is also an SEC-

registered broker-dealer and serves as a market maker on certain exchanges. In court filings and elsewhere, Jump Trading has described Jump Crypto as its "cryptocurrency arm."

17.     Defendant Jump Crypto Holdings, LLC (f/k/a 1Hold1 LLC) is a limited liability company incorporated in Delaware, with its principal place of business in Chicago, Illinois. Jump Crypto is the "cryptocurrency arm" of Jump Trading, shares office space, employees, and email servers with Jump Trading, and serves as a holding company whose subsidiaries, including Tai Mo Shan Limited, focus on trading and investing in the cryptocurrencies markets.

18.     Defendant Kanav Kariya is a resident of Illinois. From September 2021 until his resignation on June 24, 2024, Kariya was the President and public face of Jump Crypto. Previously, Kariya was Jump Trading's director of strategic initiatives, digital investments, from September 2020 until September 2021, and a quantitative researcher at Jump Trading from July 2018 to September 2020.

19.     Defendant William DiSomma is a resident of Illinois. He is a co-founder and co-owner of Jump Trading and a principal of Jump Crypto, which he managed and ran during the Class Period.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over all claims in this action pursuant to 28 U.S.C. § 1332(d)(2)(A), because this case is a class action where the aggregate claims of all members of the proposed Class exceed $5,000,000, exclusive of interest and costs, and Plaintiffs and most members of the proposed Class are citizens of a state different from Defendants.

21.     This Court also has subject matter jurisdiction over the federal claims in this action pursuant to 28 U.S.C. § 1331 because they arise under the laws of the United States.

22.     This Court also has exclusive jurisdiction over the CEA claims in this action pursuant to 7 U.S.C. § 25(c).

23.     This Court additionally has supplemental subject matter jurisdiction over Plaintiffs' state law claim pursuant to 28 U.S.C. § 1367(a) because that claim is so closely connected to the federal law claims brought herein as to form part of the same case or controversy.

24.     Venue is proper in this judicial District pursuant to 28 U.S.C. § 1391(b) and (c), and 7 U.S.C. § 25(c), because Defendants transact business in, are found in, and/or have agents in this District, and because some of the actions giving rise to this complaint took place in this District. In particular, Defendant Jump Trading and Jump Crypto are headquartered in this District, and Defendants Kariya and DiSomma reside in this District.

25.     All Defendants reside in this District, Defendant Jump Trading was previously served with process in this action, and Defendant Kariya previously waived service of process in this action. Accordingly, this Court has personal jurisdiction over all Defendants.

## FACTUAL ALLEGATIONS

### I.     Digital Assets and Crypto Commodities

#### A.     The Blockchain and Foundations of Crypto Assets

26.     This case concerns crypto assets.[1] Crypto assets are digital assets that use a variety of cryptographic principles to secure transactions, control the creation of additional units, and verify their transfer. The key technology allowing the creation of crypto assets is the blockchain.

27.     The challenge that previously prevented the creation of digital assets is the need to allow for secure transfers to exactly one recipient at a time. In general, digital files are transmitted by duplication; if someone emails a photograph to a friend, both the sender and the recipient now

---

[1] One commonly used umbrella term that collectively describes the many different types of digital assets and the many hundreds of digital tokens in circulation is "cryptocurrencies." To avoid embedding any assumptions about the nature of these assets in this umbrella term, Plaintiffs herein use the term "crypto assets" to describe the full range of digital assets, though these terms are often used interchangeably.

have copies of the photograph. While that duplication may be helpful for a photograph, it would quickly make any digital asset valueless through duplication and inflation, as one individual could send the same digital asset to many counterparties. The elaborate measures used to prevent counterfeiting of physical currencies do not have effective digital analogues.

28. Bitcoin, which was the first prominent digital asset, solved this problem with a digital ledger system called the "blockchain," which tracks the ownership and transfer of every Bitcoin in existence. Each Bitcoin user has a digital "address" used to receive Bitcoin. The Bitcoin blockchain lists, publicly, every address and the number of Bitcoin associated with that address. By looking at the blockchain, anyone can see every Bitcoin transaction in which that address has engaged. By providing a full transaction history of each Bitcoin, the blockchain allows for the secure exchange of all Bitcoin. Any attempt to duplicate a Bitcoin or to transfer it to multiple people at once would be futile, because a Bitcoin user could use the blockchain to verify each transaction involving that Bitcoin. There is thus no effective way to counterfeit Bitcoin.

29. The blockchain has become the foundational technology for crypto assets. While crypto assets vary tremendously, they generally rely on the blockchain to ensure that transactions are secure and non-duplicable. A blockchain "protocol" is an algorithm that determines how a blockchain, or a specific feature of a blockchain, functions. A blockchain protocol can record smart contracts, which automatically execute the terms of a contract when certain triggering conditions are met.

30. Control of crypto assets is attested primarily through control of cryptographic keys. These cryptographic keys have two components: a public key and a private key. This cryptographic system of transfer and exchange is generally the same across most crypto assets. To use Bitcoin as an example, the public key is used to produce the Bitcoin address. A Bitcoin address is a destination for transfers of Bitcoin, like the account number of a conventional bank account.

Bitcoin addresses are long strings of alphanumeric text, often abbreviated by a small group of numbers and letters appearing in the string, such as 1s5F or R3w9. A private key allows the owner of a Bitcoin address to access it, akin to a long PIN or password for a conventional bank account.

31.     Those who wish to transfer Bitcoin need to know the recipient's Bitcoin address, just as one transferring funds to a conventional bank account needs to know the account number for that bank account. When they have the recipient's address, transferors can use their private keys to authorize the transfer of Bitcoin, just as one would use a PIN or password to authorize a transfer between traditional bank accounts.

32.     A transfer of Bitcoin is public to the extent that anyone can see the transferor's Bitcoin address, the recipient's Bitcoin address, and the quantity of assets transferred. That is (to take a hypothetical example), anyone could see that Bitcoin address 1s5F transferred 10.3 Bitcoin to Bitcoin address R3w9. The names of the individuals or entities that control these addresses, on the other hand, are not recorded on the blockchain and ordinarily are not accessible to the public.

**B.      Crypto Commodities and Stablecoins**

33.     Bitcoin, in addition to pioneering the use of the blockchain, is also notable for having a decentralized supply of tokens based on the work of individuals not in control of the Bitcoin blockchain. This feature is core to the idea of Bitcoin, but, unlike the blockchain, is not universal among crypto assets generally.

34.     Bitcoin maintains its blockchain and provides for new Bitcoin to enter the economy through a consensus mechanism known as "proof-of-work," or "mining." Individuals "mine" Bitcoin by having sophisticated computer programs perform complex, resource-intensive automated verifications of past transactions, which are then added to the blockchain. Those who mine Bitcoin—"miners"—are rewarded with new Bitcoin.

35.     The mining process creates a scarcity that underlies the value of Bitcoin. Bitcoin is designed so it gets harder and harder to mine. The more Bitcoin produced, the more complex and resource-intensive the computations required for a miner to receive new Bitcoin. This process ensures that the supply of Bitcoin will not rise sharply or unpredictably, thus preventing a flood of new Bitcoin that could undercut the value of the preexisting Bitcoin. Likewise, the number of Bitcoin that miners receive as a reward is halved roughly every four years. This will continue until all Bitcoin have been mined, at which point miners will receive fees paid solely by network users.

36.     Bitcoin's distribution system thus roughly mirrors the availability of natural resources like gold or silver. While the supply of Bitcoin continues to grow as more of it is mined, the growth rate of that supply is logarithmic and will eventually cease entirely, ensuring the market is not flooded and Bitcoin is not devalued. This ensures market participants that their Bitcoin will not diminish in value due to sudden inflation.

37.     Bitcoin's predetermined issuance schedule and strong speculative demand contribute to wild fluctuations in price. Bitcoin's extreme price volatility has inhibited its adoption as a medium of exchange or store of value. That is because a rational purchaser will generally not want to pay for goods or services with a currency that may soon rise significantly in value, and a rational seller will generally not want to be paid for goods or services with a currency that may soon decline significantly in value. Such challenges are exacerbated in the context of economic relationships that take place over time, such as employment contracts.

38.     So-called "stablecoins" were developed as a solution to the volatility of other crypto assets by pegging their value to a reference asset such as another crypto asset (like Bitcoin), an exchange-traded commodity (like gold), or a fiat currency (like the U.S. dollar). Broadly speaking, a stablecoin's peg can be maintained in one of two ways: holding sufficient reserves of the

reference asset as collateral, or employing algorithms and smart contracts to control the supply of stablecoins in circulation.

39.     The Commodity Futures Trading Commission ("CFTC") views stablecoins as commodities. Defendant Jump Trading has not disputed that the Commodity Exchange Act applies to UST, and in fact has argued in the action captioned *Patterson v. Terraform Labs, Pte. Ltd.*, No. 5:22-cv-03600 (N.D. Cal.), that UST is *not* a security (and that, by implication, it is a commodity subject to the CEA).

40.     On October 15, 2021, the CFTC issued orders simultaneously filing and settling charges (for $42.5 million) against several entities doing business as "Tether" and "Bitfinex" in connection with the U.S. dollar tether token ("USDT") stablecoin. The orders reflected the CFTC's view that USDT was a commodity traded in interstate commerce.

41.     The CFTC's December 13, 2022 complaint against Sam Bankman-Fried, FTX Trading Ltd., and Alameda Research LLC, filed in the Southern District of New York, reiterated the CFTC's view that stablecoins like USDT are commodities.

42.     On March 8, 2023, CFTC Chairman Rostin Behnam confirmed the CFTC's view that stablecoins are commodities, telling reporters: "Based on the cases that [the CFTC has] brought around stablecoins, I think that there's a strong legal argument that USDC and other similar stablecoins would be commodities." Behnam was referring to USD Coin, another stablecoin pegged to the U.S. dollar that is issued by the company Circle.

## II.     The Terra Blockchain and Its Stablecoin, UST

43.     In 2018, Kwon and TFL began creating the Terra blockchain (also called the "Terra Protocol" or simply "Terra") with the aim of creating a successful stablecoin. Terra's initial crypto asset, LUNA, was first offered on January 30, 2019. LUNA was not a stablecoin but was rather the native token of the Terra blockchain, allowing its holders to vote on governance decisions and

to lock up (or "stake") their LUNA in exchange for rewards (for example, receipt of transaction fees from other users or additional, newly minted LUNA tokens).

44.     In April 2019, Kwon and researchers from TFL published a white paper entitled "Terra Money: Stability and Adoption" (the "UST Whitepaper"), which proposed a family of stablecoins pegged to the value of the world's major fiat currencies, including a stablecoin called TerraUSD ("UST") pegged to the U.S. dollar. The white paper explained:

> Recognizing strong regionalities in money, Terra aims to be a family of cryptocurrencies that are each pegged to the world's major currencies. Close to genesis, the protocol will issue Terra currencies pegged to USD, EUR, CNY, JPY, GBP, KRW, and the IMF SDR.[2] Over time, more currencies will be added to the list by user voting….

> It is important, however, for Terra currencies to have access to shared liquidity. For this reason, the system supports atomic swaps among Terra currencies at their market exchange rates. A user can swap TerraKRW for TerraUSD instantly at the effective KRW/USD exchange rate. This allows all Terra currencies to share liquidity and macroeconomic fluctuations; a fall in demand by one currency can quickly be absorbed by the others.

45.     In the UST Whitepaper and elsewhere, TFL and Kwon stated that UST would maintain its $1 peg through an algorithm tying the supply of UST to that of LUNA and creating arbitrage opportunities for traders. Specifically, this algorithm would purportedly maintain UST's price at $1 through a complex system in which, rather than being backed by actual dollars, UST would be "minted" (*i.e.*, created) and "burned" (*i.e.*, destroyed) in parallel with LUNA: holders of LUNA could swap $1 worth of LUNA for one UST token, and holders of UST could likewise exchange one UST token for $1 worth of LUNA.

46.     The algorithm theoretically provided an arbitrage opportunity for traders to help keep the price of UST pegged at one dollar. If, for example, the trading price of UST slipped to

---

[2] These currency abbreviations correspond, respectively, to U.S. dollars, Euros, Chinese Yuan, Japanese Yen, British pounds sterling, South Korean won, and special drawing rights of the International Monetary Fund.

$0.95, traders could buy UST at that price then burn it to mint $1 worth of LUNA, earning $0.05 profit in the exchange. In theory, traders seeking arbitrage opportunities would continue to bid up the price of UST until it regained its $1 peg.

47.     On or around April 24, 2019, TFL and Kwon publicly launched the Terra blockchain and created one billion LUNA tokens. The initial code for the Terra blockchain was written by Kwon, though TFL also maintained code repositories that enabled employees to maintain and update the Terra blockchain's coding and protocols.

### A.     Jump's Relationship with TFL and Sales of UST

48.     Defendant Jump Trading, through its "cryptocurrency arm" Defendant Jump Crypto, was an early partner and financial backer of TFL and its Terra blockchain. Defendant DiSomma managed and ran the Jump Crypto team. Any deal or trading strategy required DiSomma's approval. Defendant Kariya was Jump Crypto's public face and developed relationships with other participants in the crypto industry. At all relevant times, all Jump Crypto officers and employees, including Defendants DiSomma and Kariya, worked out of Jump Trading's offices in Chicago and communicated using their Jump Trading email accounts.

49.     During a March 1, 2022 episode of Jump Crypto's podcast "The Ship Show," Kwon and Defendant Kariya stated that they first met in 2019 to discuss Terra and UST. Kwon later gave deposition testimony describing TFL's relationship with Jump:

> Q.     And what services, if any, did Jump Trading provide to Terraform Labs?
>
> A.     It was — so over the years, from 2019, I had developed a personal relationship with several officers and employees of Jump Trading. I'd run into them at conferences. I just started to hang out with several of the staff. They worked with us in a number you have different capacities. There were major purchases of the ANC token. They ended up acquiring a lot of purchase options for Luna. And my understanding was, even though it wasn't a contractual relationship, that they were heavy traders of a lot of the assets in the Terra ecosystem.

50.     Beginning in or around November 2019, Kwon (on behalf of TFL or one or more of its wholly owned subsidiaries) negotiated a series of agreements with Defendant Kariya (on behalf of Defendants Jump Trading and Jump Crypto).

51.     The first of these was a Master Loan Agreement, dated November 19, 2019 and signed by Kwon on behalf of a wholly owned subsidiary of TFL and by Matther Hinerfeld, the general counsel of both Jump Trading and Jump Crypto, on behalf of Jump Crypto's wholly owned subsidiary Tai Mo Shan Limited ("Tai Mo Shan"). Pursuant to this agreement, TFL's subsidiary loaned 30 million LUNA tokens to Tai Mo Shan so Jump could provide market-making services for LUNA and UST. A market maker provides liquidity for an asset by standing ready to sell or buy the relevant assets on demand, ensuring there is a counterparty to every transaction. The 30 million LUNA tokens were delivered to Jump on or before November 30, 2019. In exchange for its services, Jump, through Tai Mo Shan, received options to buy up to 30 million LUNA tokens at set strike prices—all less than $1—over the following three years. Although these strike prices were a few cents above the trading price of LUNA at the time, LUNA subsequently traded for more than $90 in secondary markets.

52.     On January 13, 2020, Kwon emailed TFL's top 5 investors to inform them of "an important arrangement" that TFL had "entered into with Jump Trading" to "improve liquidity" of LUNA, because its performance had been "rather lackluster." Kwon explained that, pursuant to the deal, Jump would be "rewarded with call options for Luna." Kwon noted, "At Jump's request, we are keeping this arrangement strictly confidential." Kwon later testified that it was Defendant Kariya who had asked to keep the arrangement between TFL and Jump strictly confidential.

53.     Jump began selling LUNA into the market in July 2020.

54.     On August 21, 2020, Defendant Kariya wrote to his staff at Jump Trading that Jump was "pushing for a significantly larger deal in a push to make [UST] the dominant stablecoin."

Kariya added that "[t]he value" that Jump would "look to add in addition to thicker LUNA markets" was to promote "[l]iquid terra [sic] stablecoin markets" and to "[a]ssist in helping expand (and contract) the supply on LUNA to keep the market fed and keep the [UST] peg in line." Kariya made clear that Jump's deal with TFL was "deeply in the money," meaning very lucrative, for Jump.

55.     Between August 26 and September 2, 2020, Defendant Kariya and another Jump employee, Tak Fujishima, exchanged emails with Kwon and TFL's chief financial officer, CJ Han, concerning Jump's proposed incentive deal with TFL. Part of the "[g]entleman's agreement" that Kariya proposed to Kwon was for Jump to "support trading on terra stable coin pairs on all exchanges we're connected to and help maintain the peg." Kariya wrote, "I believe we've structured incentives that align us in the most direct fashion, with numbers that push the boundaries of what is attainable in the market. These targets hopefully provide the flywheel effects that propel Terra to the top of the stablecoin pyramid." TFL and Jump ultimately reached an agreement on terms and, over the following week, they executed a Loan Confirmation pursuant to the November 2019 Master Loan Agreement. As with the Master Agreement, the Loan Confirmation was signed by Kwon on behalf of the same TFL subsidiary. Tak Fujishima signed the Loan Confirmation on behalf of Jump Crypto's subsidiary Tai Mo Shan.

56.     On September 9, 2020, Kariya wrote from his Jump Trading email address to Jump's leadership and staff that Jump had "a second deal with Terra on the books and it's a big one! … Headline item – We have the ability to earn options on up to 65M LUNA struck at $0.4." As Kariya described it, Jump's goal was "to make UST *feel real*" to market participants and "feed them while their mouths are open" by "smoothly facilitating feedback loops" between LUNA and UST to create demand. According to Kariya, "The more Terra stablecoins exist, the more valuable

LUNA gets," and thus the more Jump stood to "monetize [Jump's] position when the protocol is really running which is exactly what we want to do."

57.     Pursuant to the Loan Confirmation, TFL's subsidiary would loan up to 13 tranches of 5 million LUNA tokens (for a total of 65 million tokens) to Jump Crypto's subsidiary Tai Mo Shan based on Jump's achievement of two categories of milestones: tranches 1 through 7 were based on the number of UST tokens that Jump created, and tranches 8 through 13 were based on Jump's average daily trading volume of UST. Kwon later testified that the purpose of the loan structure was "to incentivize Jump Trading to create and trade UST." As with the Master Loan Agreement, the Loan Confirmation granted Jump, through Tai Mo Shan, the option to buy up to the total loan balance, 65 million LUNA tokens, at a set price, $0.40, that was a bit higher than the $0.32 trading price for LUNA at the time, but far less than the more than $90 trading price that LUNA later experienced. Jump met the first threshold and began receiving LUNA tokens on a monthly basis pursuant to the Loan Confirmation beginning in January 2021.

58.     Also in or around September 2020, TFL and Kwon launched UST and announced plans to make UST available on "every major blockchain." Kwon stated that UST's stabilizing algorithm would avoid the kinds of "emergency measures" necessary to restore the $1 pegs for other stablecoins, like the Dai stablecoin available on the Ethereum blockchain. Kwon further stated that UST's sister stablecoin TerraKRW had a proven track record of success across Asia, and he marketed the ability of UST to "be swapped to TerraKRW (and visa versa [sic]) on-chain with negligible [foreign-exchange] fees."

59.     In early April 2021, TFL and Jump agreed to modify the terms of the Loan Confirmation. Like the prior Loan Confirmation, the Amended and Restated Loan Confirmation was signed by Kwon on behalf of TFL and by Tak Fujishima on behalf of Jump Crypto's subsidiary Tai Mo Shan. Pursuant to the amendment, the maximum loan remained 65 million

LUNA tokens and the strike price remained $0.40, but the number of tranches was reduced to 10 (from 13); the quantity of LUNA tokens to be distributed for each of tranches 5, 6, and 7 was doubled to 10 million; and the milestones needed to receive those three tranches were increased significantly. On April 7, 2021, days after the Amended and Restated Loan Confirmation was signed, Jump satisfied the milestones for additional tranches.

60. Between January and April 2021, Jump, through Tai Mo Shan, received approximately 3.5 million LUNA tokens that it was entitled to borrow pursuant to the Loan Confirmation. On April 30, 2021, the trading price of LUNA was $16.68, nearly 42 times Jump's strike price of $0.40 per token.

61. On February 10, 2021, Defendant Kariya asked Kwon to communicate exclusively through the disappearing message app Signal. Kariya wrote, "Compliance feels much mor [sic] comfortable here with the disappearing chats." Three weeks later, on March 2, 2021, Kariya followed up, "Compliance really stepping up the heat on moving over to Signal." These messages illustrate Defendants' knowing and improper efforts to destroy evidence of their misconduct, and their knowledge that they were acting improperly.

62. Kariya and Kwon's Signal messages to each other also revealed the closeness between Jump and TFL. According to a July 2024 article in *Fortune*,[3] in February 2021, Kariya messaged Kwon, "I think I'm going to have to get a dog named Terra by the end of this year too." Kwon responded, "Name him Luna. Then it matches mine." Kwon added, "Hope you get carry from this," referring to Kariya making money from Jump's LUNA holdings. "Better than just making bill [DiSomma] slightly richer lol."

---

[3] Leo Schwartz, *The Rise and Fall of a Crypto Whiz Kid: How 25-year-old Kanav Kariya Went from President of Jump Crypto to Pleading the Fifth*, Fortune (July 11, 2024) https://fortune.com/2024/07/11/jump-trading-kanav-kariya-crypto-terra-do-kwon-disaster/.

63.     On March 19, 2021, TFL announced "Terra Bridge," TFL's online portal for transferring assets between the Terra, Ethereum, and Binance blockchains through the use of smart contracts to burn assets from the source blockchain and mint an equivalent amount of assets on the destination blockchain.

64.     As of May 19, 2021, there were approximately 2.1 billion UST tokens in circulation. Between May 19 and May 27, 2021, the daily trading volume of UST ranged between approximately 68 million and 265 million tokens.

65.     In the spring of 2021, a team of eight to ten Jump Trading employees who specialized in high-frequency trading of traditional securities began exclusively supporting Jump Crypto's activities, including market making of UST and other tokens, with the goal of incentivizing public adoption of UST.

**B.      The Market for UST Was Efficient**

66.     UST traded in an efficient market during the Class Period.

67.     In addition to burning $1 of LUNA to mint one UST token, a person could, throughout the Class Period, purchase UST on any number of secondary markets, including TFL's Terra Station platform and crypto-asset exchanges Binance, Coinbase, Osmosis, crypto.com, and KuCoin.

68.     Trading information for UST, including price and daily trading volume, was readily available during the Class Period on widely viewed crypto-market analysis websites like CoinMarketCap.

69.     UST experienced large daily trading volumes of between several million and more than 100 million tokens during the Class Period.

70.     There was significant analyst coverage of the UST market during the Class Period, including on specialized crypto-market analysis websites like CoinMarketCap and on more general forums like Twitter and Reddit.

71.     There were market makers for UST, including Jump itself, during the Class Period.

72.     Accordingly, the price of UST, which was supposed to remain at or close to $1, changed quickly to reflect new information—in fact, that was the principal basis for the algorithm that TFL claimed would maintain the $1 peg. That new information was principally about UST's price: when it dipped below or rose above $1, traders would take immediate advantage of the arbitrage opportunity to swap between one UST token and $1 of LUNA.

**C.      Jump Manipulates the Market for UST and Artificially Inflates Its Price to Maintain the Appearance of a $1 Peg**

73.     Until mid-May 2021, there were no significant market disruptions to UST. Then, on May 19, 2021, UST unexpectedly fell significantly below $1, dropping by nearly 10%. Holders of UST immediately began swapping their tokens for $1 of LUNA to take advantage of the arbitrage opportunity purportedly presented by TFL's algorithm. As the volume of UST-for-LUNA swaps rose, however, the swap fees charged by TFL also rose, quickly eliminating the arbitrage spread and risking a collapse of UST's market price.

74.     TFL, Kwon, Jump, and its leaders, including Defendants DiSomma and Kariya, knew that the algorithm was failing and, without their intervention, the market price of UST would collapse. Accordingly, beginning on or around May 21, 2021, TFL and Kwon secretly began scheming with Jump to artificially and covertly inflate the price of UST by having Jump purchase of massive amounts of UST, in manner designed to conceal Jump's role, to restore the false appearance of UST's $1 peg, at least for a time. Defendant Kariya's phone records show that he called Kwon at least twice on May 21.

75.     On May 23, 2021, Kwon told TFL's business development lead, Jeff Kuan, that Kwon was "speaking to Jump about a solution" to UST's de-peg. Indeed, Defendant Kariya's phone records show that Kariya called Kwon at least five times throughout the day on May 23. Kuan then wrote to TFL's communications lead, Brian Curran, "Do [Kwon] just randomly called me ... [W]e're speaking to jump [sic] about a solution." Curran responded that he also "[s]poke with Do" and that TFL was going to "deploy $250 million from stability reserve through Jump to stabilize the peg." In later testimony, Curren explained what he meant:

> Q.     And you say we're going to deploy 250 million from the stability reserve. What is the stability reserve?
>
> A.     It was a base of capital controlled by the company that they had control over since the launch of the network.
>
> Q.     And what kind of capital?
>
> A.     It was called SDR, which stands for special drawing rates, which is like an international basket of currencies.
>
> Q.     And so what would that mean in layman's terms?
>
> A.     Basically, the company was providing money from this reserve to Jump Trading.
>
> Q.     And what did you understand the purpose was?
>
> A.     To help stabilize the peg.
>
> Q.     And when you say stabilize the peg, how was that supposed to impact the price of UST?
>
> A.     Bring it closer to $1.

76.     In a separate meeting of at least ten Jump executives and employees the same day, Defendant Kariya stated to Defendant DiSomma, "I spoke to Do and he's going to vest us," meaning that Kwon and TFL had agreed to waive the conditions precedent to Jump's receipt of discounted LUNA tokens if Jump helped re-peg UST to $1.

77.     Defendant DiSomma immediately began directing Jump's traders to modify their trading models to achieve a re-peg of UST's market price to $1. According to the sworn testimony of a former Jump employee who witnessed DiSomma giving those instructions, DiSomma told Jump's traders "how to adjust the models so that they could trade differently," and specifically to "adjust the parameters" of their models for "buying and selling UST" to "send bigger orders or move the orders around in price, that sort of thing." These "models were more aggressive" and "were not behaving in typical sort of like market making style" that Jump typically engaged in, "which is to basically, you know, not really take a position and just behave in a way where you're just trying to make money off the spread, rather than like the movement of the asset." Instead, Jump's trading model, pursuant to the changes that DiSomma continued to direct over the next few days, "was just more aggressive, and the orders were more bigger, the trading was more aggressive," and resulted in Jump "accumulate[ing] a large position of UST." DiSomma stated that he was "was willing to risk up to a couple hundred million dollars" of Jump's own capital to re-peg UST's price to $1. In other words, Jump's massive purchases of UST were motivated not by any attempt to make money on those trades, but instead were intended to restore an artificial $1 price for UST. The primary, if not sole, reason for Jump to make these purchases was artificially to influence the market price of UST.

78.     From May 23 to May 27, 2021, at DiSomma's direction, Jump made net purchases of more than 62 million UST tokens, including purchases of approximately **10 million** UST tokens in just one half-hour period on the morning of May 23. By comparison, prior to May 23, 2021, Jump typically would have traded just 5 million UST tokens across an entire 24-hour period. By the end of each of Jump's concentrated bursts of purchases beginning on May 23, 2021, the price of UST was higher than it had been when Jump began buying, showing that Jump's massive purchases were having the desired real-time effect of artificially inflating the price of UST.

- 21 -

79.     Jump made these large purchases of UST—which represented nearly 10% of the total trading volume between May 23 and 27, 2021, as well as nearly all the trading volume during certain half-hour periods—on multiple centralized crypto-asset exchanges, including KuCoin. Because these purchases occurred off the blockchain, and because centralized exchanges keep transaction records confidential, members of the public could not have known that Jump, or any single entity, was making these massive purchases of UST over such concentrated periods of time. Jump's decision to spread its purchases over multiple exchanges is further evidence that it intended to artificially boost UST's price and hide its role in doing so.

80.     As depicted in the chart below, prepared by the SEC, UST's market price began to rise on May 23, 2021, just as Jump began its large-scale purchases, and was artificially inflated to near its $1 peg within days.



81.     These high-volume trades were intended by Jump to artificially restore, and succeeded in artificially restoring, UST's $1 peg. Without Jump's intervention, and given the failure of TFL's algorithm to restore UST's $1 peg, the true market forces of supply and demand would have pushed the price of UST down toward $0 in May 2021, which would have avoided significant losses to Plaintiffs and other Class members, who acquired UST after that time. Indeed,

TFL's communications lead Brian Curran later testified that Kwon expressly acknowledged Jump's role in re-pegging UST to $1 and saving TFL's business during a September 2021 call:

> In the phone call, [Kwon] basically disclosed to me that Jump Trading and Terraform Labs had a prior contractual agreement dating back years. There was three conditions in this contract that had to be met. One of the last conditions, the third one, was that [Jump] would step in in a liquidity crisis such as in May 2021. So they had fulfilled the contract. He elaborated on the extent of their relationship and involvement in May 2021 and told me that if they had not stepped in, we might have been fucked.

Curran further testified that he "was directed not to" publicly disclose Jump's role in re-pegging UST by Kwon himself, reflecting Defendant Kariya's repeated requests to Kwon that he keep Jump's role a secret.

82.     After UST's price was restabilized by Jump's intervention, Defendant DiSomma gave Jump's trading team feedback concerning the sale of UST and advised them not to cause another de-peg by selling UST too quickly. Early in the morning of May 24, 2021, as UST's $1 peg was being restored, DiSomma sent a message to four Jump traders: "Broader market watching [with respect to] stable coins." One of the traders, Dave Olsen, responded, "Looks like we didn't take much of a directional LUNA position since yesterday pm...am I reading that right?" DiSomma wrote, "we were able to sell over a mil [sic] LUNA above 6.5 in rally today which put us flat on the day. We also bought 1.4 mil yesterday and more in previous days but the gun is partially reloaded." Olsen responded, "Yep ... seems like the prop to Do was well timed. Lots of wood to chop still, but feels like a good start. That how you're seeing it?" DiSomma replied, "We [sic] bracing for another sell storm. It's a good start." Another Jump trader, David Heatley, asked, "did we get him to vest us?" Although DiSomma did not respond to the last question, his actions made clear that Jump intervened to artificially re-peg UST to $1 in order to remove the conditions to acquiring discounted LUNA tokens pursuant to the Amended and Restated Loan Confirmation.

83.     Indeed, to compensate Jump for its secret market manipulation, and in furtherance of their fraudulent scheme, Kwon (on behalf of TFL) agreed to further amend the Loan

Confirmation to remove all conditions requiring Jump to achieve trading benchmarks before receiving discounted LUNA tokens. Like the Loan Confirmation and the Amended and Restated Loan Confirmation before it, the Second Amended and Restated Loan Confirmation was signed by Kwon on behalf of TFL and by Tak Fujishima on behalf of Jump Crypto's subsidiary Tai Mo Shan. Although the document was dated as of July 21, 2021, the criminal indictment against Kwon alleges that the underlying agreement was made "[o]n or about May 23, 2021." Indeed, Defendant Kariya expressly stated to Defendant DiSomma and other Jump executives on May 23, 2021 that Kwon was "going to vest" Jump, meaning that TFL would waive the conditions precedent to Jump's receipt of discounted LUNA tokens. This Second Amended and Restated Loan Confirmation expressly provided that TFL would unconditionally deliver the remaining 61,458,334 LUNA tokens on a monthly schedule: 4.8 million tokens by September 1, 2021; 1.2 million tokens on the first of each month from October 2021 through August 2025; and the final 258,334 tokens by September 1, 2025. As with the prior version of the Loan Confirmation, this agreement gave Jump, through Tai Mo Shan, the option to buy up to the entire loan balance at $0.40 per token, a significant discount from LUNA's then-trading price of $6.67 per token.

84.     As a result of this scheme, Jump gained over ***$1.28 billion*** by subsequently selling the steeply discounted LUNA it had acquired under the modified agreements.

85.     After UST was artificially inflated to its apparent $1 peg in late-May 2021, purchasers poured billions of dollars more into UST.

### D.     Defendants' Cover-Up of UST's Instability and the May 2021 Price Manipulation

86.     Following Jump's artificial inflation of UST to its apparent $1 peg, TFL, Kwon, Kariya, and other Jump representatives falsely and misleadingly represented to the public that UST's $1 peg had been restored by TFL's automated algorithm (and not Jump's direct, manual intervention), giving the market the false and misleading impression that the re-peg had occurred

- 24 -

without the active intervention of Jump's massive purchases of UST, that TFL's algorithm worked, that UST was likely to remain effectively pegged to $1, and that UST was far more valuable and less risky than was in fact the case.

87.     For example, in a series of tweets on May 23, 2021—following Kwon's secret deal with Jump and in the midst of Jump's large-scale purchases intended to manipulate the market for UST—Kwon responded to critics, whom he called "cockroaches," and falsely denied that UST's price was being manipulated:



88.     The next day, May 24, 2021, TFL bragged on Twitter about UST's purported self-correction, using further deceptive language as follows: "Terra is designed with explicit, real-time levers … that traditional banking models cannot match…. Algorithmic, calibrated adjustments of

economic parameters are more effective than faxes and suits in meetings." TFL's communications

lead, Brian Curran, later testified that he personally published these tweets on behalf of TFL. Those

tweets, however, concealed the truth about Jump's manipulative intervention to artificially restore

the appearance of UST's $1 peg as follows:



89.     Indeed, Curran later testified that Kwon had expressly instructed him to hide

Jump's role in restoring UST's $1 peg, reflecting Defendant Kariya's repeated requests to Kwon

for secrecy:

> Q.     Was Jump's role mentioned here?
>
> A.     No.
>
> Q.     Why not?
>
> A.     I had asked Do Kwon if we could mention the Jump aspect in the post mortem, and he said no.
>
> Q.     Did he explain why?
>
> A.     No.
>
> Q.     Did you accept that?

A.   Yeah. In any professional work environment, there needs to be an implicit degree of trust between employers and employees, so I assume there was some valid reason as to why not.

Q.   But why did you originally ask to include Jump?

A.   It seemed relevant based on what he was telling people at the company.

Q.   And what was he telling people in the company?

A.   That Jump was deploying large amounts of capital to help stabilize the peg.

90.   On August 9, 2021, TFL announced that Terra Bridge would begin using a protocol called "Wormhole" to facilitate asset transfers between the Terra, Ethereum, and Binance blockchains, and would begin allowing transfers to and from the Solana blockchain. This announcement came just days after Jump, which was already a major partner of Solana, acquired Wormhole. The Jump-controlled Wormhole bridge continued to fuel the enormous growth and increasing purchaser base of UST.

91.   The next day, Kwon tweeted his excitement about Wormhole's ability to make UST available on the Solana blockchain, stating in part:



- 27 -

92.    In September 2021, following the formal announcement of Jump Crypto as Jump's cryptocurrency arm, TFL tweeted congratulations, mentioning that Jump had been a "consummate Terra partner" that had "quietly played a pivotal role in the Terra ecosystem for a long time":



93.    In response, Kariya tweeted that it had "been a real pleasure" working with Kwon and TFL "over the last couple years." Both TFL and Kariya failed to disclose Jump's "pivotal role" included intervening to restore UST's $1 peg, as reflected in the following tweets:



The above disclosures were misleading because they failed to explain the true role Jump had played in artificially propping up the Terra stablecoin.

94.     On October 11, 2021, Jump Crypto officers Peter Johnson and Shanav Mehta chose to publish an article on the website of Jump's affiliate Jump Capital, entitled "Stablecoins: The Impending Rise of Multi-Trillion Dollar Market." This article appears to have been written and published from the United States and hosted on servers located in the United States. The article described UST as "[t]he most prominent example" of an "[a]lgorithmically stabilized" stablecoin, meaning it "use[d] an algorithmic monetary policy, often featuring a second floating value token, to keep the stablecoin value stable." The article described UST as "the most elegant solution for creating a highly scalable and more decentralized stablecoin." The article failed to disclose that UST's algorithm was capable of supporting only a limited spread, and that it was only Jump's active intervention months earlier that had re-pegged UST to $1, not TFL's "algorithmic monetary policy," which had failed. By describing UST as "[a]lgorithmically stabilized," the article gave the market the misleading impression that an automated algorithm—not Jump's affirmative, clandestine intervention—was responsible for re-pegging UST to $1 in May 2021. This misleading impression was reinforced by the article's description of UST's purported "algorithmic monetary policy" as an "elegant solution," a phrase that would never be used to describe Jump's massive purchases of approximately 62 million UST tokens over the course of five days to re-peg UST to $1.

95.     On October 20, 2021, Kwon tweeted that Wormhole "brings UST" to the Solana, Ethereum, and Binance blockchains, writing that "Web3 will be a network of connected blockchains, and $UST will pave its highways."

96.     In January 2022, TFL announced the formation of a non-profit organization called the Luna Foundation Guard ("LFG"), which would purportedly serve as an asset reserve to defend

UST's $1 peg. Six venture capital firms, including Jump Crypto, funded LFG. LFG's purportedly independent "Governing Council" comprised Kwon, his TFL co-cofounder Nicholas Platias, Defendant Kariya, and three other individuals. LFG had no employees of its own. The announcement also characterized the May 2021 de-pegging of UST as a source of "important lessons." In this announcement, LFG and TFL declared that "UST weathered a massive, reflexive drawdown in the LUNA price in May [2021]" "[b]y concentrating almost explicitly on bootstrapping the demand-side of algorithmic stablecoins," which purportedly disproved the purported "misconception that algo [sic] stablecoin designs are unsustainable." The announcement—which on information and belief was made with the approval of Defendants from within the United States—failed to mention that it was Jump's scheme with TFL and Kwon to manipulate the market for UST, and not TFL's algorithm, that had propped up the price of UST to its apparent $1 peg. The omission of Jump's key role in artificially stabilizing the price of UST gave the market the misleading impression that the stability of UST's $1 peg was, and would continue to be, maintained *automatically* by TFL's algorithm and was in fact a "stablecoin." In fact, the opposite was true—TFL's algorithm was broken and incapable of supporting UST's $1 peg, and TFL could maintain the peg only with the help of Jump's covert trading to prop it up.

97.     LFG's website (which on information and belief was financially supported by Jump and others) further repeated the false claims that UST's $1 peg was effectively maintained by its algorithm, stating that unlike other stablecoins "backed by fixed deposits of the pegged fiat currency or over-collateralized in another DeFi asset, the value of Terra's family of stablecoins is maintained through a system of arbitrage incentives, open market operations, and dynamic protocol levers that maintain robust peg stability ... primarily accomplished by the Terra protocol design." The website further stated that "[n]either LFG nor any other entity that assisted with the UST Reserve protocol profit from it." This statement—which on information and belief also was

made with the approval of Defendants from within the United States—omitted the material fact that Jump had made over ***$1.28 billion*** in profits from selling the LUNA tokens it received at a steep discount in exchange for artificially propping up the price of UST. LFG was initially funded with 50 million LUNA tokens provided by TFL, which at the time were valued at billions of dollars. The omission of these facts from LFG's statement, which is attributable to Defendants because they approved it and Kariya sat on LFG's governing council, gave the market the misleading impression that UST's re-peg was accomplished by TFL's algorithm and financially disinterested parties. In reality, Jump had a profit motive to conceal, and did conceal, its direct intervention that re-pegged UST to $1, because disclosing it would have risked the stability and growth of UST, the associated value of LUNA, and thus Jump's ability to "monetize" the discounted LUNA tokens with which TFL had bribed Jump to restore UST's $1 peg.

98.     Also in January 2022, Kariya published a Twitter thread in an attempt to quell any "panic" surrounding UST, stating that it was "difficult to imagine a sustained mass exodus to UST given the circumstances. In the event it occurs, there is potential for UST to be sold/burned and provide some downward pressure on Luna price." Kariya was referring to the purported algorithmic and arbitrage-based opportunities to keep UST at its purported $1 peg, but he made no mention of Jump's prior active involvement in artificially manipulating the price of UST after TFL's algorithm had failed in May 2021. Kariya published this Twitter thread, on information and belief from within the United States, as follows:





99.     On March 1, 2022, Kwon and Kariya recorded the first episode of Jump Crypto's podcast "The Ship Show." On information and belief, the episode was recorded in, hosted in, and disseminated from within the United States. During that episode, Kwon reiterated the false statement that UST maintained its $1 peg in a "purely algorithmic kind of way," without disclosing the scheme to manipulate the price of UST to maintain its apparent $1 peg, stating in pertinent part as follows:

> So the easy way of explaining how UST maintains peg is that LUNA absorbs the volatility of Terra stablecoins. So at any given point, you can mint one Terra USD by burning a dollars [sic] worth of LUNA, and then you can always redeem one Terra USD for a dollars [sic] worth of LUNA as well. So during times in which the market demand for UST falls, there's an arbitrage incentive. So for example, if LUNA starts to trade at 90 cents, then traders can make money by buying UST from the open market, swapping it to LUNA and then capture a 10% arb[itrage] profit. On the other side, if UST is trading at 1.1 dollars, you can buy a dollars [sic] worth of LUNA from the market, swap it to UST and then capture 10% arb[itrage] profit that way. So insofar as you have a liquid market for LUNA at some market value, UST is able to facilitate minting redemptions in a highly scalable, ***purely algorithmic kind of way***. (Emphasis added.)

100.     Kwon further misrepresented during the episode that UST's "slippage" and "deviat[ion] from the peg" in May 2021 had been "naturally" and "automatically self-heal[ed]" by TFL's algorithm:

> Similar to what happened in May of 2021, where there were too many UST redemptions that we're looking to happen against LUNA, in which case the AMM slippage costs rose the other way. And it took a few days for the slippage cost to ***naturally heal*** back to spot. So that's another feature of the market module where when the exchange rate has deviated from the peg, ***the protocol automatically self-***

> *heals* the exchange rate back to whatever the spot price is being quoted by the
> oracle. So that's why it took several days for the peg to recover. (Emphasis added.)

Kwon falsely and misleadingly omitted the truth about Jump's active intervention to artificially

inflate the price of UST. Kariya participated in the podcast but failed to correct any of Kwon's

false and misleading statements.

101.    During the same podcast, Defendant Kariya expressly noted Jump's years-long

relationship with TFL, while misleadingly omitting any mention of Jump's active role in propping

up the price of UST in May 2021, stating in pertinent part as follows:

> I'd say the third bucket of what we've been really involved in is, of course, in
> governance and helping protocols build. So we put in the two of the early
> governance proposals that helped scale the UST floor back when UST was a 10
> million supply last December … in helping protocols that are working through
> complex trading problems, implement these strategies to achieve kind of maximum
> success while being aligned with them in the best way possible, right. …
>
> So there's a place that the LFG comes into it arguments is [sic] Do talked about
> how you can potentially create or redeem UST by interacting with LUNA markets
> and, like I said, LUNA liquidity is kind of paramount to making that stable and
> robustly possible at reasonable size in periods where the UST economy is
> significantly contracting or expanding…. Do started off saying the first time we
> spoke was in 2019, and I hadn't really quite internalized that until now. And so,
> yeah, it's been really, really awesome working with you and the rest of the Terra
> community for over two years now. Kind of quite stunning to think about how far
> things have come, so yeah, just wanted to say that it's been awesome.

102.    In March 2022, Kariya responded to a tweet about potential "arbitrage"

opportunities for UST traders by stating that "UST is in high demand [at the moment] and is

generally trading at a premium." Kariya again misleadingly omitted any mention of Jump's prior

intervention to manipulate the price of UST. Kariya published this tweet, on information and belief

from within the United States, as follows:



103. The statements identified in ¶¶ 86–102, above, were materially false and misleading when made. As Defendants knew, or were reckless in not knowing, Jump, by covertly purchasing more than 62 million UST tokens between approximately May 23 and May 27, 2021, artificially inflated the price of UST to regain its $1 peg. These secret purchases across multiple digital platforms, and Defendants' materially false and misleading statements and omissions as detailed herein, had the effect of artificially inflating and maintaining the price of UST until its collapse in May 2022. In addition, as Defendants knew or recklessly disregarded, UST was subject to a material undisclosed risk of collapse in the face of market volatility: UST was not effectively pegged to $1, the TFL algorithm used to maintain the UST peg had failed and was likely to fail again in the future, and Defendants had entered into a scheme to conceal these adverse facts, as well as to conceal their manipulative actions in furtherance of the scheme and their ill-gotten proceeds from the purchasing public. These misrepresentations misled Plaintiffs and other members of the Class, who purchased UST on the reasonable beliefs that its price was based on legitimate market activities; that UST would maintain a price at or near $1; that Defendants' statements regarding UST were truthful and materially complete; and that following its May 2021 de-peg, UST had, as Kwon put it, "automatically self-heal[ed]"—in other words, that UST's algorithm had allowed UST to maintain an effective $1 peg even in the face of market disruptions and that it was insulated from such shocks in the future.

104. Had Defendants not covered up the truth about their intervention to artificially restore UST's $1 peg, its price would have immediately fallen to reflect the failure of TFL's algorithm to automatically maintain the peg. As a direct result of Defendants' choice to actively conceal their intervention and promote the lie that TFL's algorithm worked, the price of UST was artificially inflated throughout the Class Period.

105. Defendants continually traded UST throughout the Class Period from within the United States, and Defendants directly profited from the growing market for UST because that market increased the value of the 65 million LUNA tokens that Jump had received as a bribe to manipulate UST's price.

106. Indeed, on October 22, 2021, Jump exercised its option to purchase 65 million LUNA pursuant to the Second Amended and Restated Loan Confirmation. Although LUNA was trading at nearly $44 per token on that day, meaning it would have cost approximately $2.86 billion to purchase 65 million LUNA tokens in the open market, Jump was able to acquire all 65 million LUNA tokens at $0.40 each, for a total of just $26 million. Jump subsequently gained over ***$1.28 billion*** by selling those discounted tokens at market prices.

### E. The Collapse of UST and the Terra Blockchain in May 2022

107. As of May 6, 2022, there were nearly 19 billion total UST tokens in circulation, a nearly ten-fold increase from the year before. Beginning on May 7, 2022, UST again de-pegged from $1, but this time the dislocation was substantially more significant; UST's price, without Jump's artificial price support, did not recover. The price of UST dropped to $0.81 on May 9, $0.16 on May 13, and under $0.06 by May 21, 2022. By the end of the Class Period, UST was essentially worthless, and the promise of pricing stability for holders of UST destroyed.

108. During this collapse, representatives of Defendant Jump discussed a possible bailout of UST with employees of Alameda Research LLC and Jane Street Group, LLC. The

- 35 -

communications took place on the encrypted messaging service Telegram. Although a bailout never happened, the CFTC is reportedly investigating Jump's involvement in the trading of crypto assets. Federal prosecutors and the SEC reportedly previously investigated Jump's conduct in connection with the collapse of TFL.

109. The collapse of UST took LUNA and the entire Terra blockchain down with it, destroying $40 billion in combined market value, including nearly $19 billion of holdings in UST. Those who owned UST lost everything.

110. Jump, however, retained the more than $1.28 billion in ill-gotten profits it obtained as a result of its May 2021 intervention to manipulate the price of UST. Jump also retained all the trading fees generated by transfers of UST through Wormhole.

### III. Defendants Successfully Concealed Their Misconduct Through 2023

111. Defendants continued to conceal their misconduct even after the collapse of UST and the Terra blockchain. On June 2, 2022, Jump published an article on the Jump Crypto website entitled "The Depegging of UST." On information and belief, the article was written in, and the website was hosted on, servers located in the United States. The article repeated the misleading description of UST as having an "automatic" mechanism to maintain its purported $1 peg, but ignored Jump's May 2021 intervention to manipulate the price of UST, stating in pertinent part as follows:

> UST was designed to maintain its peg through the on-chain mint and burn mechanism, a virtual automatic market maker (vAMM) rooted in the condition that 1 UST, irrespective of its market value, is worth approximately $1 of LUNA. This mechanism was constructed so that volatility and UST price dislocations could be smoothed out with UST and LUNA supply expansions or contractions via on-chain arbitrageurs.

112. Even though federal regulatory and criminal actions were filed against TFL and Kwon in February and March 2023 in connection with UST's collapse, Defendants' role in it was not officially confirmed for months. The SEC Complaint against TFL and Kwon and the March

23, 2023 criminal indictment of Kwon, both filed in the Southern District of New York, referred only to an unnamed "U.S. Trading Firm" or "Firm-1" that had assisted in the fraud. There was speculation in the press, but no official confirmation, that the unnamed firm was Jump.

113.     It was not until the district court overseeing the SEC's civil action against TFL and Kwon publicly issued its opinion resolving cross-motions for summary judgment and certain evidentiary disputes on December 28, 2023, that the unnamed firm was officially confirmed for the first time as Jump. The district court's opinion summarized the undisputed evidence of Jump's role and noted that two unnamed Jump executives had invoked their Fifth Amendment privilege against self-incrimination and refused to answer questions at their depositions:

> On May 19, 2021, UST's price fell below $1. On May 23, 2021, it dropped to around $0.90. That same day, Kwon had multiple communications with a Jump executive. When asked about those communications at a deposition, that Jump executive – as well as another – invoked the Fifth Amendment and refused to answer. The SEC asserts that Terraform reached a deal with Jump to take action to restore UST's $1 peg, and that, in return, Jump would no longer be required to achieve vesting conditions to receive additional LUNA tokens under earlier agreements. On the day in question, May 23, 2021, a different Jump executive told employees, "I spoke to Do [Kwon] and he's going to vest us." The same day, Kwon told Terraform's head of business development that he was "speaking to jump about a solution." Terraform's head of communications, Brian Curran, took notes at a division head meeting that day, writing that Kwon announced that the "[p]eg had to be defended" and that "Jump was deploying $100 million to buyback UST." Indeed, Jump purchased large amounts of UST in bursts that day, and UST's market price was eventually restored to near $1.00. Later that year, Kwon told Curran that if Jump had not stepped in, Terraform "actually might've been fucked." Another Terraform employee added that "they [Jump] saved our ass." (Citations omitted.)

114.     The identities of the two Jump executives who had refused to answer questions about their roles in the collapse of UST for fear of self-incrimination were not publicly identified as Defendants DiSomma and Kariya until each of them filed motions to quash trial subpoenas on March 28, 2024. Kariya's motion conceded "that the SEC's allegations [in that case] track[ed] the allegations set forth in the federal indictment against Defendant Kwon," confirming that Jump is the unnamed "Firm-1" identified in the federal indictment as assisting in the fraud. Both Kariya

and DiSomma represented to the district court that they reside and work in Illinois, and both appeared for depositions at the SEC's offices in Chicago, but then invoked their Fifth Amendment privilege against self-incrimination and refused to answer questions, and both asserted that they would again refuse to answer questions on the same basis at trial. After the district court indicated that it would admit DiSomma's and Kariya's invocations of the Fifth Amendment privilege into evidence, the SEC agreed not to call the men as trial witnesses. Stipulations that each would "invoke his Fifth Amendment rights and decline to answer questions posed by the parties about the claims asserted in this case" were read into the trial record, and the district court instructed the jury that they could draw an adverse inference that each man's testimony would have been unfavorable to TFL and Kwon.

115.    On April 5, 2024, the jury in the SEC case found TFL and Kwon liable for, among other things, fraudulently concealing Jump's role in artificially restoring UST's $1 peg. In its post-trial briefing concerning a final judgment, the SEC estimated that TFL had made net sales of $2.29 billion of UST to the public from June 2021 to May 2022. The district court ultimately ordered disgorgement from TFL of more than $3.5 billion based on both the UST scheme and another fraudulent scheme on which the jury found liability.

116.    TFL commenced bankruptcy proceedings in Delaware in January 2024. Those proceedings were ongoing as of the filing of this Amended Complaint.

117.    Also as of the filing of this Amended Complaint, Kwon's criminal proceedings in the Southern District of New York have not publicly progressed beyond the indictment because Kwon has remained abroad. The United States and South Korea both sought to extradite Kwon from Montenegro after his March 2023 arrest in that country. On August 1, 2024, an appeals court in Montenegro affirmed a lower court's ruling permitting Kwon to be extradited to South Korea, not the United States, to face criminal fraud charges relating to the collapse of TFL.

118.    On June 24, 2024, four days after several publications reported that the CFTC too was investigating Jump Trading's involvement in crypto-asset markets, Kariya abruptly resigned from his position at Jump Crypto and announced that it was his "last day at Jump."

## IV.    Plaintiffs Purchased UST During the Class Period and Suffered Damages

119.    Plaintiffs made purchases of UST during the Class Period, throughout which the price for UST had been manipulated by Defendants' conduct as detailed herein and was persistently artificial.

### A.    Individual Plaintiff Allegations

#### 1.    Plaintiff Kim

120.    Plaintiff Kim purchased UST through two crypto exchanges during the Class Period. Plaintiff Kim initiated and completed each of these transactions in the United States, including through servers located in the United States and managed by U.S. personnel. Specifically, he made the following purchases and sales:

- On November 18, 2021, Plaintiff Kim purchased approximately $108.58 in UST.

- On December 9, 2021, Plaintiff Kim purchased approximately $993.12 in UST.

- On December 12, 2021, Plaintiff Kim purchased approximately $32,731.27 in UST.

- On December 17, 2021, Plaintiff Kim purchased approximately $2,971.29 in UST.

- On January 19, 2022, plaintiff Kim sold approximately $603.03 in UST.

- On March 1, 2022, Plaintiff Kim sold approximately $804.73 in UST.

- On March 27, 2022, Plaintiff Kim purchased approximately $32,859.56 in UST.

- On April 1, 2022, Plaintiff Kim sold approximately $600.84 in UST

- On April 5, 2022, Plaintiff Kim purchased approximately $29,818.90 in UST.

- On April 12, 2022, Plaintiff Kim purchased approximately $29,764.90 in UST.

121.    Plaintiff Kim held title to UST at the time of the collapse of UST, and as a direct and proximate result of Defendants' misconduct, Plaintiff Kim suffered more than $112,000 in actual damages under applicable law.

### 2.    Plaintiff Patel

122.    Plaintiff Patel purchased UST through two crypto exchanges during the Class Period. Plaintiff Patel initiated and completed each of these transactions from within the United States, including through servers located in the United States and managed by U.S. personnel. Specifically, he made the following purchases and sales:

- In January 2022, Plaintiff Patel purchased approximately $999.89 in UST.

- In February 2022, Plaintiff Patel purchased approximately $982,717.51 in UST and sold approximately $1,231.10 in UST.

- In March 2022, Plaintiff Patel purchased approximately $877,610.74 in UST.

- In April 2022, Plaintiff Patel sold approximately $249,059.87 in UST.

- Between May 16 and 26, 2022, in the midst of the collapse of UST, and in a futile attempt to recoup some of his losses, Plaintiff Patel purchased approximately $1,626,961.21 in UST and sold approximately $1,878,559.60 in UST.

123.    Plaintiff Patel held title to UST at the time of the collapse of UST, and as a direct and proximate result of Defendants' misconduct, Plaintiff Patel suffered approximately $1.85 million in actual damages under applicable law.

### 3.    Plaintiff Woolley

124.    Plaintiff Woolley purchased UST through two crypto exchanges during the Class Period. Plaintiff Woolley initiated and completed each of these transactions in the United States. Specifically, he made the following purchases:

- On January 4, 2022, Plaintiff Woolley purchased approximately $506.44 in UST.

- On February 7, 2022, Plaintiff Woolley purchased approximately $942.68 in UST.

- On February 9, 2022, Plaintiff Woolley purchased approximately $9,949.34 in UST.

- On February 11, 2022, Plaintiff Woolley purchased approximately $24,984.96 in UST.

- On February 26, 2022, Plaintiff Woolley purchased approximately $9,414.70 in UST.

125.    Plaintiff Woolley, who did not sell any UST during the Class Period, held title to UST at the time of the collapse of UST, and as a direct and proximate result of Defendants' misconduct, Plaintiff Woolley suffered nearly $45,000 in actual damages under applicable law.

### 4.    Plaintiff Worsham

126.    Plaintiff Worsham purchased UST through three different platforms during the Class Period. Plaintiff Worsham initiated and completed each of these transactions in the United States. Specifically, he made the following purchases and sales:

- On August 16, 2021, Plaintiff Worsham purchased approximately $1,001.50 in UST.

- On August 23, 2021, Plaintiff Worsham purchased approximately $19,928.31 in UST.

- On March 7, 2022, Plaintiff Worsham purchased approximately $23,965.24 in UST.

- On March 11, 2022, Plaintiff Worsham purchased approximately $2,900.00 in UST.

- On April 6, 2022, Plaintiff Worsham purchased approximately $2,000.00 in UST.

- On April 7, 2022, Plaintiff Worsham purchased approximately $2,999.99 in UST.

- On April 11, 2022, Plaintiff Worsham purchased approximately $18,000.00 in UST.

- Between May 14 and 16, 2022, in the midst of the collapse of UST, and in a futile attempt to recoup some of his losses, Plaintiff Worsham purchased approximately $28,949.56 in UST and sold approximately $34,220.88 in UST.

127.    Plaintiff Worsham held title to UST at the time of the collapse of UST, and as a direct and proximate result of Defendants' misconduct, Plaintiff Worsham suffered more than $65,000 in actual damages under applicable law.

B.    **Allegations Concerning All Plaintiffs**

128.    The four named Plaintiffs had no direct interactions with any Defendants and were never in privity with any Defendants on any contract. Plaintiffs purchased UST from a variety of crypto-trading exchanges and platforms, none of which was owned or run by any Defendant. As a direct and proximate result of Defendants' wrongful conduct and the collapse of UST, the four named Plaintiffs collectively suffered more than $2 million in actual damages under applicable law, and members of the Class suffered billions of dollars in actual damages under applicable law.

129.    More than $87,000 of the named Plaintiffs' collective UST losses—approximately $78,000 for Plaintiff Patel, $7,000 for Plaintiff Worsham, and under $5,000 for each of Plaintiffs Kim and Woolley—are attributable to UST tokens that Plaintiffs held in crypto-asset wallets at the time of the collapse. On information and belief, approximately one-quarter of all UST holdings were held in such a manner by members of the Class.

130.    The remaining approximately $1.98 million of the named Plaintiffs' collective UST losses are attributable to UST tokens that were loaned to the "Anchor Protocol," a self-described "savings protocol" created by TFL that permitted users to lend their UST to borrowers at an interest rate through a self-described "money market" established by TFL. The lenders received a depository receipt called "aUST," which entitled the lenders at any time to reclaim their deposited UST, plus interest. Title to all UST loaned to the Anchor Protocol remained with the named Plaintiffs at all times, including while the UST tokens were loaned through the Anchor Protocol, and, on information and belief, approximately three-quarters of all UST holdings were held in such a manner by the Class.

131. In this action, Plaintiffs seek recovery only as to the decrease in value of their UST holdings. Plaintiffs' claims do not arise from, and Plaintiffs do not seek to recover from Defendants, any decrease in the value of aUST or any expected returns from lending UST through the Anchor Protocol.

## CLASS ACTION ALLEGATIONS

132. Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3).

133. Plaintiffs seek class certification on behalf of all persons who, during the Class Period, purchased UST in the United States and were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Jump at all relevant times, members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

134. **Numerosity (Rule 23(a)(1))**. The Class is so numerous so as to make joinder of all members impracticable. While the exact number of identities of all individual members of the Class is currently unknown, Plaintiffs believe, and on that basis allege, that the Class consists of at least hundreds of people. For example, as of May 19, 2021, there were approximately 2.1 billion UST tokens in circulation. The number of Class members can be determined based on the blockchain and records maintained by crypto asset exchanges and other third parties.

135. **Commonality and Predominance (Rule 23(a)(2) and (b)(3))**. Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Class members, including the following:

(a) whether Defendants' conduct qualifies as a price manipulation under the federal commodities laws and implementing regulations;

(b) whether Defendants misled the market regarding the value of UST;

(c)     whether Defendants' conduct during the Class Period constituted aiding-and-abetting a price manipulation and/or a manipulative device under the federal commodities laws and implementing regulations;

(d)     whether artificial prices existed for UST during the Class Period and the extent and amount of such artificial prices; and

(e)     whether Plaintiffs and Class members have suffered damages, and, if so, the nature and extent of those damages.

136.    **Typicality (Rule 23(a)(3))**. Plaintiffs' claims are typical of the claims of the other members of the proposed Class. Plaintiffs suffered injuries as a result of Defendants' wrongful conduct that arise from the same events or course of conduct that gives rise to the Class members' claims.

137.    **Adequacy (Rule 23(a)(4))**. Plaintiffs have fairly and adequately represented and protected the interests of the Class and will continue to do so. Plaintiffs have retained competent legal counsel with experience in complex litigation and large class action cases. Plaintiffs have no interest that conflicts with the interests of the Class and are committed to pursuing this action vigorously.

138.    **Superiority (Rule 23(b)(3))**. This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. Prosecuting each action individually would impose heavy burdens upon the courts and Defendants, would pose a risk of inconsistent or varying adjudications of the questions of law and fact common to members of the Class, and would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. This proposed class action presents fewer management difficulties than individual

litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

139.    Therefore, class certification is appropriate under Fed R. Civ. P. 23(b)(3) because the above questions of law or fact predominate over any questions affecting individual members of the Class, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CAUSES OF ACTION

### COUNT I

**Commodity Price Manipulation and Manipulative Contrivance**
**CEA §§ 2(a)(1)(B), 6(c), 9(a)(2), 13(a), and 22(a)(1),**
**7 U.S.C. §§ 2(a)(1)(B), 9, 13(a)(2), 13c(a), and 25(a)(1)**
**CFTC Regulations 180.1 and 180.2 17, C.F.R. §§ 180.1 and 180.2**
**Against All Defendants**

140.    Plaintiffs restate and reallege all preceding allegations as if fully set forth herein.

141.    Plaintiffs brings this claim under CEA § 22(a)(1), 7 U.S.C. § 25(a)(1), for violations of CEA §§ 2(a)(1)(B), 6(c)(1), 6(c)(3), 9(a)(2), and 13(a), 7 U.S.C. §§ 2 (a)(1)(B), 9(1), 9(3), 13(a)(2), and 13c(a), as well as CFTC Regulations 180.1(a) and 180.2, 17 C.F.R. §§ 180.1(a) and 180.2.

142.    CEA § 22(a)(1) provides in relevant part: "Any person … who violates this chapter or who willfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter shall be liable for actual damages … caused by such violation to any other person … (B) who made through such person any contract of sale of any commodity for future delivery (or option on such contract or any commodity) or any swap; or who deposited with or paid to such person money, securities, or property (or incurred debt in lieu thereof) in connection with any order to make such contract or any swap; … (D) who purchased or sold a contract referred to in

- 45 -

subparagraph (B) hereof or swap if the violation constitutes – (i) the use or employment of, or an attempt to use or employ, in connection with a swap, or a contract of sale of a commodity, in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative device or contrivance in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after July 21, 2010; or (ii) a manipulation of the price of any such contract or swap or the price of the commodity underlying such contract or swap." 7 U.S.C. § 25(a)(1).

143.    CEA § 2(a)(1)(B) provides: "The act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person." 7 U.S.C. § 2(a)(1)(B).

144.    CEA § 6(c)(1) makes it "unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of" the rules of the Commodity Futures Trading Commission ("CFTC"). 7 U.S.C. § 9(1).

145.    CEA § 9(a)(2) makes it unlawful for "[a]ny person to manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, or of any swap, or to corner or attempt to corner any such commodity or knowingly to deliver or cause to be delivered for transmission through the mails or interstate commerce by telegraph, telephone, wireless, or other means of communication false or misleading or knowingly inaccurate reports concerning crop or market information or conditions

that affect or tend to affect the price of any commodity in interstate commerce, or knowingly to violate the provisions of section 6." 7 U.S.C. § 13(a)(2).

146. CEA § 13(a) provides that "[a]ny person who commits, or who willfully aids, abets, counsels, commands, induces, or procures the commission of, a violation of any of the provisions of this chapter, or any of the rules, regulations, or orders issued pursuant to this chapter, or who acts in combination or concert with any other person in any such violation, or who willfully causes an act to be done or omitted which if directly performed or omitted by him or another would be a violation of the provisions of this chapter or any of such rules, regulations, or orders may be held responsible for such violation as a principal." 7 U.S.C. § 13c(a).

147. In relevant part, CFTC Regulation 180.1(a), 17 C.F.R. § 180.1, makes it unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:

> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;
>
> (2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; [or]
>
> (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person ….

17 C.F.R. § 180.1(a).

148. CEA § 6(c)(3) provides in relevant part that "it shall be unlawful for any person, directly or indirectly, to manipulate or attempt to manipulate the price of any swap, or of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity." 7 U.S.C. § 9(3).

149.    CFTC Regulation 180.2, 17 C.F.R. § 180.2, provides in relevant part: "It shall be unlawful for any person, directly or indirectly, to manipulate or attempt to manipulate the price of any swap, or of any commodity in interstate commerce, or for future delivery or on or subject to the rules of any registered entity." 17 C.F.R. § 180.2.

150.    At all relevant times, neither Defendant Jump, nor Defendant Kariya, nor TFL, nor Kwon was a "registered entity" or "registered futures association" as defined under 7 U.S.C. §§ 1a(40) or 25(a)(1).

151.    CEA § 1a(9) defines "commodity" to include "goods and articles … and all services, rights, and interests … in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. § 1a(9).

152.    CEA § 1a(47)(A)(iii) defines a "swap" as, in relevant part, "any agreement, contract, or transaction … that provides on an executory basis for the exchange, on a fixed or contingent basis, of 1 or more payments based on the value or level of 1 or more … currencies, commodities, … or other financial or economic interests or property of any kind, or any interest therein or based on the value thereof, and that transfers, as between the parties to the transaction, in whole or in part, the financial risk associated with a future change in any such value or level without also conveying a current or future direct or indirect ownership interest in an asset." 7 U.S.C. § 1a(47)(A)(iii).

153.    At all relevant times, UST was a commodity in interstate commerce because it, like traditional commodities, was exchanged in a market for a uniform quality and value. Indeed, Defendant Jump Trading did not dispute in a separate litigation, *Patterson v. Terraform Labs, Pte. Ltd.*, No. 22-cv-3600 (N.D. Cal.), that UST is a commodity. Specifically, in Jump Trading's May 2, 2023 motion to dismiss the second amended complaint in *Patterson*, Jump Trading incorporated by reference the argument made by TFL and Kwon that "UST are not investment contracts or any

other type of security." *See Patterson*, No. 22-cv-3600 (N.D. Cal.) ECF No. 115, at 18 (May 2, 2023), ECF No. 122, at 39 (May 8, 2023).

154.    In addition, at all relevant times, UST was a swap or otherwise a contract of sale of any commodity in interstate commerce because it provided, on an executory basis, for the exchange of one UST token (a commodity) for $1 worth of either LUNA or another Terra stablecoin, such as TerraKRW, and transferred, as between the parties to such transaction, the financial risk associated with a future change in the value of such tokens.

155.    A substantial proportion of UST purchases were conducted by persons, including Plaintiffs, in the United States. Moreover, Defendants performed their trades of UST from the United States. Class members in the United States also exchanged money in connection with their purchases of UST in the United States. Thus, all Class members incurred irrevocable liability in the United States.

156.    On or about May 21, 2021, the price of UST de-pegged from $1. TFL, Kwon, and all Defendants implemented a scheme to have Jump make significant purchases of UST to artificially restore its $1 peg.

157.    Between approximately May 23 and 27, 2021, Defendants Jump Trading, Jump Crypto, and DiSomma intentionally or recklessly manipulated the price of UST by making net purchases of more than 62 million UST tokens on multiple crypto trading platforms to restore UST's $1 peg. These purchases contributed to and were the proximate cause of UST's peg being restored.

158.    These trades were intended by Defendants Jump Trading, Jump Crypto, and DiSomma to send, and succeeded in sending, a false signal to the market that TFL's algorithm had achieved the re-pegging of UST to its $1 peg, so that the prices for UST generated as a result of Jump's transactions were not representative of true supply and demand for UST.

159.    TFL rewarded Defendants Jump Trading and Jump Crypto for the intervention by waiving all preconditions to Jump's ability to purchase 65 million LUNA tokens at a significant discount, which Jump did in October 2021 for $26 million. Defendants Jump Trading and Jump Crypto also profited from fees generated by the use of Wormhole to facilitate asset transfers across blockchains.

160.    Persistently throughout the Class Period, Defendants Jump Trading, Jump Crypto, and Kariya intentionally or recklessly, in connection with contracts of sale of UST, directly or indirectly: used or employed, or attempted to use or employ, a scheme or artifice to defraud; and/or engaged in, or attempted to engage in, acts, practices, or a course of business that operated or would operate as a fraud or deceit on purchasers of UST.

161.    Specifically, throughout the Class Period, Defendants Jump Trading, Jump Crypto, and Kariya intentionally or recklessly made material misstatements of fact and misleading omissions concerning their manipulation of the market price for UST as detailed herein and as further summarized in part as follows:

(a)    In a series of tweets on May 23, 2021, the day Jump began manipulating UST's price, Kwon falsely denied that UST's price was being manipulated. Defendants Jump Trading, Jump Crypto, and Kariya did not correct this misstatement.

(b)    The next day, May 24, 2021, TFL tweeted that UST's $1 peg was restored through "real-time levers" and "[a]lgorithmic, calibrated adjustments." Defendants Jump Trading, Jump Crypto, and Kariya did not correct this misstatement.

(c)    In September 2021, when Jump Crypto was formally announced as Jump's cryptocurrency arm, Defendant Kariya tweeted that it had "been a real pleasure working with [Kwon] and the Terra team over the last couple of years." Kariya omitted any mention of Jump's manipulation of UST's price four months earlier.

(d)     In an October 11, 2021 blog post, two Jump Crypto officers described UST as a "prominent example" of an algorithmic stablecoin and "the most elegant solution for creating a highly scalable and more decentralized stablecoin." The post omitted any mention of Jump's prior active manipulation of UST's price.

(e)     The January 2022 announcement for LFG—which Jump Crypto funded and whose governing council included Kwon, another TFL co-founder, and Kariya—falsely stated that UST's $1 peg had been restored by TFL's algorithm and omitted the truth about Jump's intervention. Defendants approved and did not correct this misstatement.

(f)     On January 28, 2022, Kariya tweeted reassurances about UST's stability but failed to disclose Jump's prior manipulation of UST's price.

(g)     During a March 1, 2022 episode of Jump Crypto's podcast "The Ship Show," Kwon reiterated his false description of UST's re-peg as "purely algorithmic," "natural[]," and "automatically self-healing," omitting the truth about Jump's intervention. Kariya, who also participated in the episode, did not correct Kwon's false statements.

(h)     Kariya tweeted on March 8, 2022 about the "high demand" for UST, but omitted the truth about Jump's prior manipulation of UST's price.

162.    These misrepresentations and omissions concerned material information that would have influenced a reasonable purchaser. In particular, the ability of the TFL algorithm to maintain UST's $1 peg was key to its value. When making a decision to purchase a purportedly algorithmic stablecoin such as UST, a reasonable person would consider the extent to which the stablecoin's price was manipulated to maintain its $1 peg.

163.    Defendants had actual and superior knowledge of their efforts to manipulate the price of UST during the Class Period because Jump had entered into a secret agreement with Kwon and TFL to conduct that manipulation and had participated in the manipulation of UST's price

between approximately May 23 and 27, 2021 by secretly purchasing more than 62 million and subsequent misrepresentations throughout the Class Period to conceal these manipulative acts and convey false information to the market regarding the value of UST and its attendant risks.

164.    These representations were materially false and misleading because TFL's algorithm had failed to restore UST's $1 peg naturally or automatically, and instead the peg was restored because of Jump's secret intervention.

165.    Given the efficient market for UST, had the truth of Defendants' misconduct been publicly disclosed earlier, it would have been incorporated into the price of UST, avoiding significant losses incurred by Plaintiffs and members of the Class.

166.    At all relevant times, Defendants Kariya and DiSomma were acting for their own benefit and the benefit of Defendant Jump Trading and its cryptocurrency arm Defendant Jump Crypto. To the extent Kariya or DiSomma were acting as agents on behalf of Jump Trading or Jump Crypto, each is still liable for his own misconduct under CEA § 2(a)(1)(B), 7 U.S.C. § 2(a)(1)(B).

167.    As a direct and proximate result of Defendants' wrongful conduct, the named Plaintiffs individually suffered more than $2 million in actual damages under applicable law, and members of the Class suffered billions of dollars in actual damages under applicable law.

## COUNT II

**Aiding and Abetting Commodity Price Manipulation and Manipulative Contrivance
CEA §§ 2(a)(1)(B), 6(c), 9(a)(2), 13(a), and 22(a)(1)(D),
7 U.S.C. §§ 2(a)(1)(B), 9, 13(a)(2), 13c(a), and 25(a)(1)(D)
CFTC Regulations 180.1 and 180.2, 17 C.F.R. §§ 180.1 and 180.2
Against All Defendants**

168.    Plaintiffs restate and reallege all preceding allegations as if fully set forth herein.

169.    Plaintiffs bring this claim under CEA § 22(a)(1)(D), 7 U.S.C. § 25(a)(1)(D), for violations of CEA §§ 2(a)(1)(B), 6(c)(1), 6(c)(3), 9(a)(2), and 13(a), 7 U.S.C. §§ 2(a)(1)(B), 9(1),

9(3), 13(a)(2), and 13c(a), as well as CFTC Regulations 180.1(a) and 180.2, 17 C.F.R. §§ 180.1(a) and 180.2.

170.     Persistently throughout the Class Period, as detailed herein, all Defendants willfully aided, abetted, counseled, induced, or procured TFL's and Kwon's manipulation of the price of UST; manipulative device, scheme, or artifice to defraud purchasers of UST; untrue or misleading statements of a material fact regarding UST; omissions to state a material fact necessary in order to make the statements made not untrue or misleading regarding UST; and acts, practices, or courses of business that operated as a fraud or deceit upon purchasers of UST during the Class Period.

171.     On or about May 21, 2021, the price of UST de-pegged from $1. TFL, Kwon, and all Defendants implemented a scheme to have Jump make significant purchases of UST to artificially restore its $1 peg.

172.     All Defendants intentionally or recklessly manipulated the price of UST by having Jump make net purchases of more than 62 million UST tokens on multiple crypto trading platforms to restore the appearance of UST's $1 peg between approximately May 23 and 27, 2021 and making the materially false and misleading statements detailed herein throughout the Class Period.

173.     These trades and materially false and misleading statements by Defendants were intended by Defendants to send, and succeeded in sending, a false signal to the market that TFL's algorithm had achieved the re-pegging of UST to its $1 peg, so that prices for UST generated because of Jump's transactions were not representative of true supply and demand for UST.

174.     TFL rewarded Defendants Jump Trading and Jump Crypto for the intervention by waiving all preconditions on Jump's ability to purchase 65 million LUNA tokens at a significant discount, which Jump did in October 2021 for $26 million. Defendants Jump Trading and Jump

Crypto also profited from fees generated by the use of Wormhole to facilitate asset transfers across blockchains.

175. Persistently throughout the Class Period, all Defendants willfully aided, abetted, counseled, induced, or procured material misstatements of fact and misleading omissions concerning Jump's manipulation of UST's price during the Class Period as detailed herein and as summarized in part as follows:

(a) In a series of tweets on May 23, 2021, the day Jump began manipulating UST's price, Kwon falsely denied that UST's price was being manipulated. Defendants did not correct this misstatement.

(b) The next day, May 24, 2021, TFL tweeted that UST's $1 peg was restored through "real-time levers" and "[a]lgorithmic, calibrated adjustments." Defendants did not correct this misstatement.

(c) In September 2021, when Jump Crypto was formally announced as Jump's cryptocurrency arm, Defendant Kariya tweeted that it had "been a real pleasure working with [Kwon] and the Terra team over the last couple of years." Kariya omitted any mention of Jump's manipulation of UST's price four months earlier.

(d) In an October 11, 2021 blog post, two Jump Crypto officers described UST as a "prominent example" of an algorithmic stablecoin and "the most elegant solution for creating a highly scalable and more decentralized stablecoin." The post omitted any mention of Jump's prior active manipulation of UST's price.

(e) The January 2022 announcement for LFG—which Jump Crypto funded and whose governing council included Kwon, another TFL co-founder, and Kariya—falsely stated that UST's $1 peg had been restored by TFL's algorithm and omitted the truth about Jump's intervention. Defendants approved and did not correct this misstatement.

(f)    On January 28, 2022, Kariya tweeted reassurances about UST's stability but failed to disclose Jump's prior manipulation of UST's price.

(g)    During a March 1, 2022 episode of Jump Crypto's podcast "The Ship Show," Kwon reiterated his false description of UST's re-peg as "purely algorithmic," "natural[]," and "automatically self-healing," omitting the truth about Jump's intervention. Kariya, who also participated in the episode, did not correct Kwon's false statements.

(h)    Kariya tweeted on March 8, 2022 about the "high demand" for UST, but omitted the truth about Jump's prior manipulation of UST's price.

176.    These misrepresentations and omissions concerned material information that would have influenced a reasonable purchaser. In particular, the ability of the TFL algorithm to maintain UST's $1 peg was key to the value of UST. When making a decision to purchase a purportedly algorithmic stablecoin such as UST, a reasonable person would consider the extent to which the stablecoin's price was manipulated to maintain its $1 peg.

177.    Defendants had actual and superior knowledge of their efforts to manipulate the price of UST during the Class Period because Jump had entered into a secret agreement with Kwon and TFL to conduct that manipulation and had participated in Jump's manipulation of UST's price between approximately May 23 and 27, 2021 through by secretly purchasing 62 million UST and subsequent misrepresentations throughout the Class Period to conceal these manipulative acts and convey false information to the market regarding the value of UST and its attendant risks.

178.    These representations were materially false and misleading because TFL's algorithm had failed to restore UST's $1 peg naturally or automatically, and instead the peg was restored because of Jump's secret intervention.

179.    Given the efficient market for UST, had the truth of Defendants' misconduct been publicly disclosed earlier, it would have been incorporated into the price of UST, avoiding a significant amount of losses incurred by Plaintiffs and members of the Class.

180.    At all relevant times, Defendants Kariya and DiSomma were acting for their own benefit and the benefit of Defendant Jump Trading and its cryptocurrency arm Defendant Jump Crypto. To the extent Kariya or DiSomma was acting as an agent on behalf of Jump Trading or its cryptocurrency arm Jump Crypto, each is still liable for his misconduct under CEA § 2(a)(1)(B), 7 U.S.C. § 2(a)(1)(B).

181.    As a direct and proximate result of Defendants' wrongful conduct, the named Plaintiffs individually suffered more than $2 million in actual damages under applicable law, and members of the Class suffered billions of dollars in actual damages under applicable law.

## COUNT III

### Common Law Unjust Enrichment
### Against Defendants Jump Trading and Jump Crypto

182.    Plaintiffs restate and reallege all preceding allegations as if fully set forth herein.

183.    As a reward for manipulating the price of, and market for, UST, Defendants Jump Trading and Jump Crypto received more than 65 million LUNA tokens at a greater than 99% discount from their market price, which Jump later resold at a more than $1.28 billion profit.

184.    Jump Trading and Jump Crypto obtained this benefit through the wrongful conduct of price and market manipulation to manipulate the price of, and market for, UST.

185.    Jump Trading and Jump Crypto retained this benefit to the detriment of Plaintiff and members of the Class, who made purchases of UST during the Class Period in reliance on public statements by Jump Crypto, Kariya, TFL, and Kwon.

186.    Plaintiffs and members of the Class were deprived of the value of their purchases as a result of Jump Trading and Jump Crypto's manipulation when the price of, and market for, UST collapsed.

187.    Jump Trading and Jump Crypto profited from their manipulation of the price of, and market for, UST, and it would be unjust for Jump Trading and Jump Crypto to retain the more than $1.28 billion in ill-gotten gains from their misconduct, as it would violate the fundamental principles of justice, equity, and good conscience, and no contract governs the relationship between Plaintiffs or Class members and Defendants concerning this dispute.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, prays for judgment against Defendants as to each and every count, including:

A.    An order certifying this action and the Class requested herein as a class action, designating Plaintiffs as the representatives of the Class, and appointing Plaintiffs' counsel as counsel to the Class;

B.    An order declaring that Defendants' actions, as set forth above, constitute violations of the federal laws and common law set forth above, and that Defendants are liable to Plaintiffs and the Class, as described herein, for damages arising therefrom;

C.    A judgment awarding Plaintiffs and the Class all appropriate damages, in an amount to be determined at trial;

D.    A judgment awarding equitable, injunctive, and/or declaratory relief as may be appropriate including, but not limited to, rescission, restitution, and disgorgement;

E.    A judgment awarding Plaintiffs and the Class prejudgment and post-judgment interest, as permitted by law;

F.     A judgment awarding Plaintiffs and the Class costs and fees, including attorneys' fees, as permitted by law; and

G.     Such other legal, equitable, or further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs respectfully demand a trial by jury on all claims so triable.


Dated: August 9, 2024                                Respectfully submitted,

SELENDY GAY PLLC                              ROBBINS GELLER RUDMAN & DOWD LLP

/s/ Jordan A. Goldstein                          /s/ Chad Johnson
Jordan A. Goldstein                              Chad Johnson
Oscar Shine                                      Noam Mandel
Babak Ghafarzade                                 Jonathan Zweig
1290 Avenue of the Americas, 17th Floor          420 Lexington Avenue, Suite 1832
New York, NY 10104                               New York, NY 10170
jgoldstein@selendygay.com                        chadj@rgrdlaw.com
oshine@selendygay.com                            noam@rgrdlaw.com
bghafarzade@selendygay.com                       jzweig@rgrdlaw.com

                                                 Eric I. Niehaus
                                                 Brian E. Cochran
                                                 655 West Broadway, Suite 1900
                                                 San Diego, CA 92101-8498
                                                 ericn@rgrdlaw.com
                                                 bcochran@rgrdlaw.com

*Attorneys for Plaintiffs and the Proposed Class*