**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| TAEWOO KIM, KASHYAP PATEL, KERRY WOOLLEY, and KEN WORSHAM, Individually and on Behalf of All Others Similarly Situated,<br><br>                Plaintiff,<br><br>   v.<br><br>JUMP TRADING, LLC, JUMP CRYPTO HOLDINGS, LLC (f/k/a 1HOLD1 LLC), KANAV KARIYA, and WILLIAM DISOMMA,<br><br>                Defendants. | No. 1:23-cv-02921<br><br><br><br>Honorable Georgia N. Alexakis |

**DEFENDANTS' MOTION TO COMPEL ARBITRATION**
**OF AMENDED COMPLAINT**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................... 1

FACTS ......................................................................................................................... 3

I.     Plaintiffs Agreed to an Arbitration Provision with a Delegation Clause by Using
       the Anchor Protocol. .......................................................................................... 3

       A.     The Anchor Protocol Explained.............................................................. 3

       B.     Plaintiffs Used the Anchor Protocol and Agreed to its Terms of Service. ............. 4

II.    The Anchor Protocol Is Central to Plaintiffs' Claims......................................... 6

III.   Plaintiffs Allege That TFL, Kwon, and Defendants Acted Together to Concoct a
       Scheme to Manipulate the Market and Defraud Purchasers of Terra Tokens. .................. 7

ARGUMENT................................................................................................................ 9

I.     The Existence of a Clear and Unmistakable Delegation Clause Requires This
       Matter Be Sent to Arbitration, Regardless of Defendants' Status as
       Nonsignatories. ................................................................................................... 9

       A.     According to the Supreme Court, a Clear and Unmistakable Delegation
              Clause, Like That in the Anchor TOS, Requires This Matter Be Sent to
              Arbitration.............................................................................................. 9

       B.     Defendants' Ability to Enforce the Arbitration Agreement as
              Nonsignatories Is an Arbitrability Question That Is Delegated to the
              Arbitrator.............................................................................................. 13

              1.     Whether nonsignatories may enforce an arbitration clause is a
                     question of arbitrability, not contract formation, that is delegated to
                     the arbitrator........................................................................... 14

              2.     Statutes and case law further support that whether a nonsignatory
                     can enforce an arbitration provision is a question of enforceability
                     delegated to the arbitrator, and not a question of contract
                     formation................................................................................ 17

              3.     The reasoning of a minority of circuit courts upends the
                     contracting parties' expectations for delegation clauses......................... 19

II.    Even If This Court Were to Decide Whether Defendants May Compel Arbitration,
       Plaintiffs Should Be Equitably Estopped From Avoiding Arbitration. ........................... 21

       A.     Federal Common Law Supplies the Equitable Estoppel Test............................... 21

       B.     Defendants May Invoke Equitable Estoppel to Compel Arbitration of This Dispute. ................................................................................................................ 22

III.    This Dispute Falls Within the Scope of the Anchor TOS's Broad Arbitration Clause. ................................................................................................................ 25

IV.    If the Court Compels Arbitration of Only Some of Plaintiffs' Claims, Any Remaining Claims Should Be Stayed. ............................................................... 29

**CONCLUSION** ....................................................................................................... **29**

# **TABLE OF AUTHORITIES**

**Page(s)**

## **Cases**

*Ahern v. Board Of Education of City of Chicago*,
    133 F.3d 975 (7th Cir. 1998) .......................................................... 18

*Ali v. Vehi-Ship, LLC*,
    No. 17 CV 02688, 2017 WL 5890876 (N.D. Ill. Nov. 27, 2017) ........................................... 13

*America Chung Nam, LLC v. Mitsui O.S.K. Lines, Ltd*.,
    No. 2:23-CV-07676-SB-JPR, 2023 WL 8845213 (C.D. Cal. Dec. 19, 2023) ......................... 24

*Apollo Computer, Inc. v. Berg*,
    886 F.2d 469 (1st Cir. 1989) .......................................................... 15

*Arthur Andersen LLP v. Carlisle*,
    556 U.S. 624 (2009) ......................................................................... 17

*Attix v. Carrington Mortgage Services, LLC*,
    35 F.4th 1284 (11th Cir. 2022) ..................................................... 20

*Blanton v. Domino's Pizza Franchising LLC*,
    962 F.3d 842 (6th Cir. 2020) ....................................................... 15

*Bossart v. General Motors LLC*,
    No. 20-CV-11057, 2022 WL 3573855 (E.D. Mich. Aug. 19, 2022) ...................................... 16

*Boyle v. United Technologies Corp.*,
    487 U.S. 500 (1988) ........................................................................ 22

*Bufkin Enterprises, L.L.C. v. Indian Harbor Insurance Co.*,
    96 F.4th 726 (5th Cir. 2024) ........................................................ 23

*Casa Arena Blanca LLC v. Rainwater by Estate of Green*,
    No. 21-2037, 2022 WL 839800 (10th Cir. Mar. 22, 2022) ................................................. 15

*Certain Underwriters at Lloyd's London v. Argonaut Insurance Co.*,
    500 F.3d 571 (7th Cir. 2007) ........................................................ 22

*Coinbase, Inc. v. Suski*,
    144 S. Ct. 1186 (2024) .................................................................... 10

*Contec Corp. v. Remote Solution Co.*,
    398 F.3d 205 (2d Cir. 2005) ......................................................... 16

*Coons v. Yum! Brands, Inc.*,
   672 F. Supp. 3d 626 (S.D. Ill. 2023) ...................................................................... 14

*Cunningham v. Ford Motor Co.*,
   No. 21-CV-10781, 2022 WL 2819115 (E.D. Mich. July 19, 2022) ......................... 16

*Damato v. Hermanson*,
   153 F.3d 464 (7th Cir. 1998) ................................................................................. 26

*Daschbach v. Rocket Mortgage, LLC*,
   No. 22-CV-346-JL, 2023 WL 2599955 (D.N.H. Mar. 22, 2023) .............................. 3

*De Angelis v. Icon Entertainment Group Inc.*,
   364 F. Supp. 3d 787 (S.D. Ohio 2019) ................................................................... 17

*Eckert/Wordell Architects, Inc. v. FJM Properties of Willmar, LLC*,
   756 F.3d 1098 (8th Cir. 2014) ............................................................................... 16

*First Options of Chicago, Inc. v. Kaplan*,
   514 U.S. 938 (1995) ............................................................................................... 15

*Ford-Allemand v. Piedmont Natural Gas Co.*,
   No. 1:20-CV-00192-MRB, 2022 WL 3576227 (S.D. Ohio Aug. 19, 2022) ............ 16

*Gore v. Alltel Communcations, LLC*,
   666 F.3d 1027 (7th Cir. 2012) ............................................................................... 25

*Grabowski v. PlatePass, L.L.C.*,
   No. 20 C 7003, 2021 WL 1962379 (N.D. Ill. May 17, 2021) ..................... 11, 12, 14

*Grigson v. Creative Artists Agency, L.L.C.*,
   210 F.3d 524 (5th Cir. 2000) ................................................................................. 23

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
   586 U.S. 63 (2019) .................................................................................... 10, 19, 25

*Henry v. Vantage Credit Union*,
   No. 4:20-CV-01865-SRC, 2021 WL 2187908 (E.D. Mo. May 28, 2021) .............. 16

*Herrington v. Waterstone Mortgage Corp.*,
   907 F.3d 502 (7th Cir. 2018) ................................................................................. 20

*Hoffman v. Deloitte & Touche*, LLP,
   143 F. Supp. 2d 995 (N.D. Ill. 2001) ..................................................................... 23

*Holden v. Deloitte & Touche LLP*,
   390 F. Supp. 2d 752 (N.D. Ill. 2005) ..................................................................... 23

*Holmes v. Diza Tacos Streeterville, LLC*,
  No. 22 C 3378, 2023 WL 1777463 (N.D. Ill. Feb. 6, 2023)................................. 9, 10

*Hopkins v. Dell Technologies, Inc.*,
  No. 22-CV-2464-DWD, 2023 WL 3791722 (S.D. Ill. June 2, 2023)...................................... 11

*Howsam v. Dean Witter Reynolds, Inc.*,
  537 U.S. 79 (2002)..................................................................... 14, 15, 17

*In re Intuniv Antitrust Litigation*,
  No. 1:16-CV-12653-ADB, 2021 WL 517386 (D. Mass. Feb. 11, 2021) ............................... 16

*Jacobsen Gravel Co. v. IronPlanet, Inc.*,
  No. 16-2619 (RHK/LIB), 2016 WL 10879837 (D. Minn. Nov. 10, 2016) ............................ 17

*K.F.C. v. Snap Inc.*,
  29 F.4th 835 (7th Cir. 2022) ........................................................................ 15

*Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.*,
  174 F.3d 907 (7th Cir. 1999) ........................................................................ 25

*Kramer v. Toyota Motor Corp.*,
  705 F.3d 1122 (9th Cir. 2013) ...................................................................... 19

*Kuznik v. Hooters of America, LLC*,
  No. 1:20-CV-01255, 2020 WL 5983879 (C.D. Ill. Oct. 8, 2020)..................................... 11, 20

*Larson v. Speetjens*,
  No. C 05-3176 SBA, 2006 WL 2567873 (N.D. Cal. Sept. 5, 2006).......................................... 3

*Leff v. Deutsche Bank AG*,
  No. 08-CV-733, 2009 WL 1380819 (N.D. Ill. May 14, 2009)......................................... 22, 23

*Llagas v. Sealift Holdings, Inc.*,
  No. 23-30047, 2023 WL 8613607 (5th Cir. Dec. 13, 2023)................................................ 22, 23

*Loewen v. Lyft, Inc.*,
  129 F. Supp. 3d 945 (N.D. Cal. 2015) ...................................................... 11

*Mohamed v. Uber Technologies, Inc.*,
  848 F.3d 1201 (9th Cir. 2016) ............................................................... 12

*Moorman v. Charter Communications, Inc.*,
  No. 18-CV-820-WMC, 2019 WL 1930116 (W.D. Wis. May 1, 2019).................................. 11

*MouseBelt Labs Pte. Ltd. v. Armstrong*,
  674 F. Supp. 3d 728 (N.D. Cal. 2023) .................................................... 24

*Newman v. Plains All American Pipeline, L.P.*,
  44 F.4th 251 (5th Cir. 2022) ......................................................... 16

*Orgone Capital III, LLC v. Daubenspeck*,
  912 F.3d 1039 (7th Cir. 2019) ........................................................ 3

*Outokumpu Stainless USA, LLC v. Coverteam SAS*,
  No. 17-10944, 2022 WL 2643936 (11th Cir. July 8, 2022)..................... 21

*Patel v. Garland*,
  596 U.S. 328 (2022)..................................................................... 19

*Patterson 357, LLC v. Heidelberg Materials Midwest Agg, Inc.*,
  No. 23-CV-02831, 2024 WL 1301331 (N.D. Ill. Mar. 27, 2024)............... 25

*Patterson v. Jump Trading LLC*,
  710 F. Supp. 3d 692 (N.D. Cal. 2024) ......................................... 19, 24

*Pilot Inc. v. TYC Brother Industrial Co.*,
  No. 2:20-CV-02978-ODW, 2020 WL 3833597 (C.D. Cal. July 8, 2020).............. 12

*Portland General Electric Co. v. Liberty Mutual Insurance Co.*,
  862 F.3d 981 (9th Cir. 2017) ......................................................... 13

*Reidt v. Advanced Marketing & Processing*, *Inc.*,
  No. 23-CV-234-JDP, 2023 WL 8469772 (W.D. Wis. Dec. 7, 2023) .................... 11

*Rent-A-Center, West, Inc. v. Jackson*,
  561 U.S. 63 (2010)....................................................................... 20

*Robertson v. Enbridge (U.S.) Inc.*,
  No. CV 19-1080, 2020 WL 9211171 (W.D. Pa. Aug. 4, 2020) ................. 16

*Setty v. Shrinivas Sugandhalaya LLP*,
  3 F.4th 1166 (9th Cir. 2021) .......................................................... 21

*Shapiro v. Residential Homes for Rent, LLC*,
  No. 22 C 6854, 2023 WL 3436401 (N.D. Ill. May 12, 2023) ..................... 5

*Sosa v. Onfido, Inc.*,
  8 F.4th 631 (7th Cir. 2021) ....................................................... 22, 24

*Swiger v. Rosette*,
  989 F.3d 501 (6th Cir. 2021) ..................................................... 12, 18

*Symonds v. Credico (USA) LLC*,
  No. 1:20-CV-10192-ADB, 2020 WL 7075028 (D. Mass. Dec. 3, 2020)................ 16

*Tatum v. Legg Mason Wood Walker, Inc.*,
    83 F.3d 121 (5th Cir. 1996) ................................................................. 26

*Teamsters Local Union No. 705 v. L. Neill Cartage Co.*,
    No. 19-CV-07176, 2021 WL 4477888 (N.D. Ill. Sept. 30, 2021) ........................................... 14

*Thompson v. AT&T Services, Inc.*,
    No. 17 C 3607, 2018 WL 4567714 (N.D. Ill. Sept. 24, 2018) .................................................... 3

*Turner v. PillPack, Inc.*,
    No. 5:18-CV-66-TBR, 2019 WL 2314673 (W.D. Ky. May 30, 2019) ................................... 17

*Visibility Corp. v. Schilling Robotics, LLC*,
    No. 10-12280-JGD, 2011 WL 5075816 (D. Mass. Oct. 25, 2011) ........................................... 17

*Volkswagen of America, Inc. v. Sud's of Peoria, Inc.*,
    474 F.3d 966 (7th Cir. 2007) .................................................................. 29

*Wallrich v. Samsung Electronics America, Inc.*,
    106 F.4th 609 (7th Cir. 2024) .................................................................. 5

*Wilhelm v. BAM Trading Services, Inc.*,
    No. 23 CV 14906, 2024 WL 2274326 (N.D. Ill. May 20, 2024) ............................................ 25

*Williams v. Staffmark Investment LLC*,
    No. 21-CV-2456-EFM-GEB, 2022 WL 910859 (D. Kan. Mar. 29, 2022) .............................. 16

## Statutes

9 U.S.C. § 2 ................................................................................. 13

9 U.S.C. § 201 ............................................................................. 21

9 U.S.C. § 202 ............................................................................. 21

## Other Authorities

SIAC Rules 2016, SINGAPORE INTERNATIONAL ARBITRATION CENTRE (last
visited Sept. 26, 2024),
    https://siac.org.sg/siac-rules-2016 ................................................... 12

## PRELIMINARY STATEMENT

Anyone reviewing the factual allegations of the original Complaint filed by Plaintiff Taewoo Kim would think that the defendants in this action were Terraform Labs Pte. Ltd. ("TFL") or Do Kwon ("Kwon"). That remains true even after Kim filed the now operative Amended Complaint with several other new plaintiffs ("Plaintiffs"). Just as in Kim's initial pleading, Plaintiffs allege that TFL and Kwon masterminded a scheme to manipulate the price of the digital asset Terra USD ("UST"). But Plaintiffs did not sue TFL and Kwon, presumably because they know that the broad arbitration provision to which they expressly agreed would indisputably require them to arbitrate these disputes.

Instead, in an attempt to sidestep that arbitration agreement, Plaintiffs assert claims only against Defendants Jump Trading, LLC and Jump Crypto Holdings LLC (collectively "Jump"), William DiSomma (co-founder of Jump), and Kanav Kariya (former President of Jump Crypto) (together with Jump, "Defendants"). Plaintiffs, however, cannot avoid arbitration by not naming as defendants the alleged masterminds of the purported fraudulent scheme in which Defendants supposedly participated. Nor can they avoid arbitration by removing from the Amended Complaint specific factual allegations in the original Complaint that make plain that arbitration is required. Rather, based on clear law from the Supreme Court, this Circuit, and courts around the country, this Court should compel arbitration.

Plaintiffs allege that they bought UST and loaned it to the Anchor Protocol (a "savings protocol" available to users of the Terraform blockchain) to earn interest on their deposits. Indeed, in the Amended Complaint, Plaintiffs allege that over 95% of their losses are attributable to UST they deposited into the Anchor Protocol. To use the Anchor Protocol, Plaintiffs agreed to be bound by the Anchor Terms of Service ("Anchor TOS"), to which TFL was the named counterparty. The Anchor TOS include a broad arbitration clause as well as a clear and unmistakable delegation

1

clause. That arbitration clause requires binding arbitration of any dispute "arising out of or relating to the Interface, this Agreement, . . . or any other acts or omissions for which you may contend that we are liable," and also explicitly delegates any threshold "claim or controversy as to arbitrability" to the arbitration tribunal. But instead of arbitrating their claims as they agreed, Plaintiffs try to avoid arbitration by only naming the Defendants in the Amended Complaint and omitting TFL. They cannot circumvent arbitration in this manner. Under the Federal Arbitration Act ("FAA") and controlling precedent, suing only nonsignatories does not allow Plaintiffs to skirt their obligations to arbitrate.

Because the arbitration provision clearly and unmistakably delegates to the arbitration tribunal, among other things, "any claim or controversy as to arbitrability," an arbitration tribunal—*not* a court—must decide whether Plaintiffs are required to arbitrate their claims. Thus, once the Court determines that a valid arbitration agreement exists (one unquestionably does), Plaintiffs must be compelled to arbitrate. Any remaining questions, including whether Defendants, as nonsignatories, can enforce the arbitration clause against Plaintiffs (or whether Plaintiffs' claims fall within the agreement's scope), are for the arbitration tribunal to decide.

But even were this Court to conclude that this Court, rather than the arbitration tribunal, should resolve the threshold question of whether a nonsignatory may compel arbitration, it should find that Plaintiffs are estopped from avoiding arbitration. Plaintiffs' theory of liability rests on alleged collusive misconduct between Defendants and a signatory, TFL. Under clear law from this Court, when a plaintiff who agreed to an arbitration provision alleges collusive behavior between a signatory to that arbitration clause and a nonsignatory, that plaintiff must arbitrate his claims against the nonsignatory. While that should be the end of the matter given the presence of the delegation clause, were the Court to delve further into the scope of what claims the arbitration

2

clause covers, the Court should find that all of Plaintiffs' claims against Defendants fall within the broad scope of the arbitration clause.

## **FACTS**[1]

I.  **Plaintiffs Agreed to an Arbitration Provision with a Delegation Clause by Using the Anchor Protocol.**

A.  **The Anchor Protocol Explained.**

The Anchor Protocol was a function on the Terraform blockchain that permitted users to deposit the stablecoin UST and, in exchange, receive aUST and thereby earn interest on their deposit. *See* Am. Compl. ¶¶ 29, 130.[2]  TFL launched it on March 17, 2021 (Compl. ¶ 45),[3] which was *before* the alleged manipulative conduct in May 2021 that is at the heart of the Complaint and *before* the alleged Class purchased UST and aUST.  Am. Compl. ¶ 1 (defining "Class Period" as May 23, 2021, to May 25, 2022).  As alleged in the original Complaint, Kwon and TFL publicized the possibility of earning a substantial (i.e. 20%) return on deposits of UST on the Anchor Protocol.

---

[1] Defendants draw these facts from the allegations in the Amended Complaint and the original Complaint, but do not concede that any of those facts are true, and instead assume their truth only for the purposes of this motion to compel arbitration. While Plaintiffs are bound by the allegations in their Amended Complaint, Defendants, on this motion, may also rely on Plaintiff Kim's allegations in his initial Complaint as admissions of a party opponent. *See Orgone Cap. III, LLC v. Daubenspeck*, 912 F.3d 1039, 1048 (7th Cir. 2019) (holding that "amended pleading does not operate as a judicial tabula rasa" and thus "a party may offer earlier versions of its opponent's pleadings as evidence of the facts therein" (citation omitted)).  Doing so here is appropriate because a motion to compel arbitration is reviewed under a standard similar to a motion for summary judgment, rather than a motion to dismiss.  *See infra* Facts, Section I.B & n. 6; *Thompson v. AT&T Servs., Inc.*, No. 17 C 3607, 2018 WL 4567714, at *7 (N.D. Ill. Sept. 24, 2018) (recognizing that motion to compel arbitration "must be decided on evidence, not allegations").  Thus, in resolving motions to compel arbitration, courts consider plaintiffs' allegations in the original pleadings. *See, e.g.*, *Daschbach v. Rocket Mortg., LLC*, No. 22-CV-346-JL, 2023 WL 2599955, at *3 (D.N.H. Mar. 22, 2023) ("[T]he court will consider [plaintiff's] admissions in his original complaint in deciding [defendant's] motion to compel arbitration under the summary judgment standard…."); *Larson v. Speetjens*, No. C 05-3176 SBA, 2006 WL 2567873, at *5 (N.D. Cal. Sept. 5, 2006) (considering "[p]laintiffs' statements in the original complaint in its ruling on the instant motion [to compel arbitration]"), *order clarified*, No. C 05-3176 SBA, 2006 WL 3365589 (N.D. Cal. Nov. 17, 2006).

[2] Amended Complaint, *Kim v. Jump Trading LLC*, No. 1:23-cv-02921, Dkt. No. 60 (N.D. Ill. Aug. 9, 2024) ("Am. Compl.").

[3] Complaint, *Kim v. Jump Trading LLC*, No. 1:23-cv-02921, Dkt. No. 1 (N.D. Ill. May 9, 2023) ("Compl.").

Compl. ¶ 2 ("In addition, Kwon and TFL touted the possibility of earning stable returns by depositing UST in a 'yield-bearing' account called the 'Anchor Protocol,' in exchange for a deposit receipt in the form of aUST, which could later be swapped for the original amount of UST, plus interest."); *id.* ¶ 45 ("Kwon further marketed the possibility of depositing UST into TFL's 'yield-bearing' savings account called the Anchor Protocol.").

### B.     Plaintiffs Used the Anchor Protocol and Agreed to its Terms of Service.

In his original Complaint, Plaintiff Kim admitted that he accessed and used the Anchor Protocol to obtain the "nearly 20% interest" promised to holders of aUST.  Compl. ¶¶ 73, 83–84 (stating that Plaintiff Kim swapped UST "for aUST via the Anchor Protocol").  Indeed, Kim provided a detailed accounting of the UST amounts he deposited into the Anchor Protocol in exchange for aUST and the dates for each deposit.  *Id.* ¶¶ 83–84.  Now, in an apparent effort to evade arbitration, Plaintiff Kim deletes from the Amended Complaint those details that demonstrably establish his use of the Anchor Protocol.  *Compare* Compl. ¶¶ 83–84 *with* Am. Compl. ¶ 120.  The new Plaintiffs do not allege the specific amounts of UST they swapped for aUST.  Nevertheless, they admit that they deposited the overwhelming majority of their UST holdings into the Anchor Protocol.  Am. Compl. ¶¶ 128–130 (alleging that of "more than $2 million in [Plaintiffs'] actual damages" from UST's collapse, "approximately $1.98 million of the named Plaintiffs' collective UST losses are attributable to UST tokens that were loaned to the 'Anchor Protocol'").[4]

---

[4] In his original Complaint, Plaintiff Kim alleged that the vast majority of UST held by other purchasers in the market was deposited into the Anchor Protocol.  Compl. ¶ 72 (alleging that as of May 6, 2022, 14 billion of 19 billion UST in circulation was in the Anchor Protocol).  That too is deleted from the Amended Complaint.

By accessing and using the Anchor Protocol, Plaintiffs agreed to the Anchor TOS.[5]  The Anchor TOS are an agreement to which TFL is the named counterparty, i.e., the signatory.  *See* Declaration of Arrash Chris Amani, Ex. A, *Patterson v. Terraform Labs, Pte. Ltd.*, No. 5:22-cv-03600, Dkt. No. 122-1 (N.D. Cal. May 8, 2023) ("Amani Decl.").[6]  When connecting a digital wallet to use the Anchor Protocol, users are first presented with a link to the Anchor TOS that they are required to accept by clicking a button immediately above an acknowledgement stating, "By connecting, I accept Anchor's Terms of Service."  *See id.* ¶¶ 2–3.  Those words appear on the wallet connection dialog box presented online.  *Id.* ¶ 3.  The dialog box presented to prospective users also permits them to review the Anchor TOS by a link in bright green text to indicate a hyperlink.  *Id.* ¶ 4.  In underlined text in the Anchor TOS, the prospective user is informed that the Anchor TOS contain a mandatory individual arbitration clause.  *Id.* ¶ 5.  The Anchor TOS have been in place since the Anchor Protocol launched and, in relation to the issues relevant here, have not changed.  *Id.* ¶ 2.

The Anchor TOS contain an arbitration clause as well as a clear and unmistakable delegation clause.  The Anchor TOS's arbitration clause requires any dispute "arising out of or

---

[5] Although Plaintiffs specifically deny being "in privity with any Defendants on any contract" (Am. Compl. ¶ 128), they tellingly stop short of denying that they agreed to the Anchor TOS, including their broad arbitration provision.

[6] This Court may look to facts outside of the Amended Complaint given that the standard for a motion to compel arbitration is akin to the standard applied at summary judgment.  *See Wallrich v. Samsung Elecs. Am., Inc.*, 106 F.4th 609, 618 (7th Cir. 2024) ("While the FAA does not provide the evidentiary standard applicable for determining whether to compel arbitration, we (as well as our sister circuits) have analogized the standard needed to that required at summary judgment.  A district court may conclude as a matter of law that parties did or did not enter into an arbitration agreement only if no genuine dispute of material fact exists as to the formation of the agreement."); *Shapiro v. Residential Homes for Rent, LLC*, No. 22 C 6854, 2023 WL 3436401, at *2 n.2 (N.D. Ill. May 12, 2023) ("The Court may consider documents outside the pleadings in ruling on a motion to compel arbitration.").  TFL filed the Amani Declaration in support of its motion to compel arbitration in the *Patterson* case in the Northern District of California, where the plaintiff alleges the same facts on which Plaintiffs bring their claim here (except that it alleges securities, not commodities, fraud).  A copy of the Amani Declaration has been filed in this case as Exhibit 1 to the Declaration of Jonathan D. Cogan, dated September 26, 2024.

relating to the Interface, this Agreement, . . . or any other acts or omissions for which you may contend that we are liable" to be "finally resolved by arbitration in Singapore in accordance with the Arbitration Rules of the Singapore International Arbitration Centre." *See* Amani Decl., Ex. A § 18. The Anchor TOS further delegate to the arbitration tribunal the power to decide "any question regarding this Agreement's existence, validity or termination" and "any claim or controversy as to arbitrability." *See id.* at § 18.[7] The term "Interface" refers to "https://anchorprotocol.com/, a website ('Site') that provides access to https://app.anchorprotocol.com/, a website-hosted user interface (the 'App') (collectively referred to as the 'Interface')." *See id.*, Ex. A Preamble. The term "Agreement" refers to the Anchor TOS. *Id.*

## II. The Anchor Protocol Is Central to Plaintiffs' Claims.

In the original Complaint, Plaintiff Kim openly described the key role of the Anchor Protocol in the Terra ecosystem, his own use of the Anchor Protocol, and his interactions with "aUST," the digital asset received in exchange for deposits of UST on the Anchor Protocol. Compl. ¶¶ 2, 45, 72–73, 75, 83–84. In apparent response to Jump Trading's first motion to compel—which, *inter alia*, highlighted that Kim's prior allegations referenced aUST "over 110 times" (Dkt. No. 55 at 5)—Plaintiffs carefully delete from the Amended Complaint most of the references to aUST and to the Anchor Protocol. Still, the Amended Complaint alleges that most of Plaintiffs' UST tokens "were loaned to the 'Anchor Protocol'" and that, as lenders, Plaintiffs "received a

---

[7] Specifically, the Anchor TOS state:

> Any claim or controversy arising out of or relating to the Interface, this Agreement, including any question regarding this Agreement's existence, validity or termination, or any other acts or omissions for which you may contend that we are liable, **including (but not limited to) any claim or controversy as to arbitrability** ("Dispute"), shall be referred to and finally resolved by arbitration in Singapore in accordance with the Arbitration Rules of the Singapore International Arbitration Centre ("SIAC Rules").

Amani Decl., Ex. A § 18 (emphasis added).

depository receipt called 'aUST,' which entitled [Plaintiffs] at any time to reclaim their deposited UST, plus interest." Am. Compl. ¶ 130. According to Kim's original allegations, high percentages of UST were deposited into the Anchor Protocol because depositors were "promised returns of nearly 20% interest." Compl. ¶ 73.[8] That Plaintiffs have tactically omitted these allegations from the Amended Complaint does not avoid the logical consequence of such facts: the Anchor Protocol is central to the alleged manipulative scheme and the arbitration provision in the Anchor TOS is binding on Plaintiffs.

### III. Plaintiffs Allege That TFL, Kwon, and Defendants Acted Together to Concoct a Scheme to Manipulate the Market and Defraud Purchasers of Terra Tokens.

Although the Amended Complaint only names Jump and two senior personnel as defendants, Plaintiffs allege that those defendants acted together with TFL and Kwon to carry out the alleged manipulative scheme that is the central basis of their claims. Indeed, the omission of Kwon and TFL as defendants is glaring given the leading role they allegedly played in the purported scheme.

The Amended Complaint opens with its core theory that "Defendants schemed with [Kwon and TFL] to manipulate the market price for UST and to conceal their manipulation, for their own benefit." Am. Compl. ¶ 1. Similar allegations of such concerted misconduct then pervade the Amended Complaint. *See id.* ¶ 4 (alleging that "TFL and Kwon secretly schemed with Defendants

---

[8] Similarly, the plaintiffs in the parallel *Patterson* class action filed in California have alleged that the Anchor Protocol and its 20% fixed return on deposits were what drew them into the Terra ecosystem in the first instance and that the Terra ecosystem lasted so long only because the 20% rate drove investment in UST; otherwise, according to them, it would have collapsed much sooner. *See* Third Amended Compl. ¶ 54, *Patterson v. Terraform Labs, Pte. Ltd.*, No. 5:22-cv-03600, Dkt. No. 156 (N.D. Cal. Jan. 25, 2024) ("Anchor was by far the most popular protocol in the Terra ecosystem."); *id.* ¶ 178 ("Both the size of the deposits in Anchor and the ballooning interest payments owed to investors became too much for the Terra ecosystem to bear."); *see also* Second Amended Compl. ¶ 26, *Patterson v. Terraform Labs, Pte. Ltd.*, No. 5:22-cv-03600, Dkt. No. 102 (N.D. Cal. Feb. 23, 2023) ("[T]he Anchor Protocol was at [*sic*] the primary driver of the Terra ecosystem's collapse.").

to manipulate and pump the market price for UST by making secret, coordinated trades"); *id.* ¶ 74 (alleging that "TFL and Kwon secretly began scheming with Jump to artificially and covertly inflate the price of UST"); *id.* ¶ 103 (alleging that "UST was not effectively pegged to $1, the TFL algorithm used to maintain the UST peg had failed and was likely to fail in the future, and Defendants had entered into a scheme to conceal these adverse facts, as well as to conceal their manipulative actions in furtherance of the scheme and their ill-gotten proceeds from the purchasing public"); *id.* ¶ 156 ("TFL, Kwon, and all Defendants implemented a scheme to have Jump make significant purchases of UST to artificially restore its $1 peg.").

The scheme allegedly began when UST fell below its $1 peg in May 2021. Plaintiffs claim that TFL "incentivize[d] . . . Jump" to manipulate the price of UST, *see* Am. Compl. ¶¶ 5, 57, and that TFL, Kwon, and Defendants entered into a "secret agreement" to that effect. *See id.* ¶¶ 163, 177. And, according to Plaintiffs, per that agreement, Jump "interven[ed] to maintain the artificial $1 peg for UST." *Id.* ¶ 7.[9]

Then, as Plaintiffs tell it, TFL and Kwon hid Jump's involvement from the public, and Defendants "aided and abetted TFL's and Kwon's concealment of Jump's May 2021 intervention." Am. Compl. ¶ 7; *see also id.* ¶¶ 170, 175 (asserting that "all Defendants willfully aided, abetted, counseled, induced, or procured" both "TFL's and Kwon's manipulation of the price of UST" and "material misstatements of fact and misleading omissions concerning Jump's manipulation of UST's price"). Plaintiffs further claim that "TFL, Kwon, Kariya and other Jump representatives falsely and misleadingly represented to the public that UST's $1 peg had been restored by TFL's

---

[9] Plaintiffs also cite to a complaint filed by the Securities and Exchange Commission against TFL and Kwon in the Southern District of New York. They allege that this complaint stated that "a 'U.S. Trading Firm' … had colluded with TFL and Kwon to restore UST's artificial $1 peg," and claim that Jump is that unnamed firm. *See* Am. Compl. ¶ 9.

automated algorithm (and not Jump's direct, manual intervention)." *See id.* ¶ 86. Plaintiffs similarly recite a list of statements allegedly made by TFL, Kwon, and certain Defendants in furtherance of their purported scheme and which, importantly for Plaintiffs' claims, "failed to mention that it was Jump's scheme with TFL and Kwon to manipulate the market for UST, and not TFL's algorithm, that had propped up the price of UST to its apparent $1 peg." *See id.* ¶ 96; *see also id.* ¶ 99 (alleging that "Kwon reiterated the false statement that UST maintained its $1 peg in a 'purely algorithmic kind of way,' without disclosing the scheme to manipulate the price of UST to maintain its apparent $1 peg").

Plaintiffs assert they were injured, along with other putative class members, by this alleged coordinated and joint scheme because it had "the effect of artificially inflating and maintaining the price of UST until its collapse in May 2022." Am. Compl. ¶ 103.

## <u>ARGUMENT</u>

### I.     The Existence of a Clear and Unmistakable Delegation Clause Requires This Matter Be Sent to Arbitration, Regardless of Defendants' Status as Nonsignatories.

That Plaintiffs agreed to the Anchor TOS, alongside its arbitration provision and delegation clause, means that an arbitration tribunal—not the Court—must decide (i) whether nonsignatories like Defendants can enforce the arbitration agreement and (ii) if Plaintiffs' claims fall within the broad scope of the arbitration provision. This conclusion follows from decisions by the Supreme Court, Courts of Appeals around the country, and district courts in this Circuit (and others).

#### A.     According to the Supreme Court, a Clear and Unmistakable Delegation Clause, Like That in the Anchor TOS, Requires This Matter Be Sent to Arbitration.

"[P]arties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy," through a delegation clause. *Holmes v. Diza Tacos Streeterville, LLC*, No. 22 C 3378, 2023 WL

1777463, at *2 (N.D. Ill. Feb. 6, 2023) (citation omitted).  Where a contract delegates by "clear and unmistakable evidence" threshold questions of arbitrability, the arbitrator, and not the court, must resolve those questions.  *See id.* (citing *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69 (2019)).

The Supreme Court has made clear that, when a contract contains a delegation clause, "a court may not override the contract" and "possesses **no power** to decide the arbitrability issue." *Henry Schein*, 586 U.S. at 68 (emphasis added).  In *Henry Schein*, the Court rejected the argument that because the arbitration clause carved out certain types of disputes from its scope, a court could ignore the delegation clause on the theory that the resulting argument for arbitration was "wholly groundless." *Id.* at 65–66, 68 ("[S]ome other Courts of Appeals have determined that the court rather than an arbitrator should decide the threshold arbitrability question if, under the contract, the argument for arbitration is wholly groundless . . . . We conclude that the 'wholly groundless' exception is inconsistent with the text of the Act and with our precedent.").  Thus, *Henry Schein* leaves no doubt that, where a delegation clause exists, a court must allow an arbitrator to decide threshold questions of arbitrability, irrespective of the court's own views on the merits of those questions.[10]

Here, there exists a valid agreement to arbitrate with a clear and unmistakable delegation clause.  The delegation clause explicitly states that "any claim or controversy as to arbitrability"

---

[10] The Supreme Court's recent decision in *Coinbase, Inc. v. Suski*, 144 S. Ct. 1186 (2024), has not altered *Henry Schein*'s rule.  Indeed, the Supreme Court reiterated in *Coinbase* that where, as here, the signatories "have agreed to only one contract, and that contract contains an arbitration clause with a delegation provision, then, absent a successful challenge to the delegation provision, courts must send all arbitrability disputes to arbitration."  144 S. Ct. at 1194.  In *Coinbase*, unlike in this case, the signatories had two conflicting contracts, one sending arbitrability disputes to arbitration, and the other sending arbitrability disputes to the courts.  In that unique circumstance, the Supreme Court held that a court should decide which contract governs, but specifically differentiated this dueling contract scenario from one where (as here) there was only one contract at issue.

shall be resolved by arbitration in Singapore. Amani Decl., Ex. A § 18. Courts have found similar language to be sufficiently clear and unmistakable. *See, e.g.*, *Kuznik v. Hooters of Am., LLC*, No. 1:20-CV-01255, 2020 WL 5983879, at *4 (C.D. Ill. Oct. 8, 2020) (finding arbitration provision giving arbitrator power to decide "questions of arbitrability" and incorporating JAMS rules as having "doubly satisfied" the requirement to clearly and unmistakably delegate); *Hopkins v. Dell Techs., Inc.*, No. 22-CV-2464-DWD, 2023 WL 3791722, at *6 (S.D. Ill. June 2, 2023) (finding that arbitration provision that stated that "[t]he arbitrator shall have exclusive authority to resolve any arbitrability issues" to "provide clear and unmistakable evidence of the parties' intent to delegate"); *Loewen v. Lyft, Inc.*, 129 F. Supp. 3d 945, 954 (N.D. Cal. 2015) (finding clause that required arbitration of questions of "the arbitrability of any dispute" to be a clear and unmistakable delegation clause (citation omitted)), *abrogated on other grounds by Henry Schein*, 586 U.S. 63; *Reidt v. Advanced Mktg. & Processing*, *Inc.*, No. 23-CV-234-JDP, 2023 WL 8469772, at *3 (W.D. Wis. Dec. 7, 2023) ("Cutting to the core, the delegation provision says: 'Any claim or controversy arising out of or relating to your use of our web site, . . . including but not limited to any claim or controversy as to arbitrability, shall be finally and exclusively settled by binding arbitration.' That is a clear statement that questions of arbitrability are delegated to the arbitrator." (citation omitted)); *Moorman v. Charter Commc'ns, Inc.*, No. 18-CV-820-WMC, 2019 WL 1930116, at *7 (W.D. Wis. May 1, 2019) ("Here, the language in the Agreement requiring that an arbitrator is to consider 'all disputes related to the arbitrability of any claim or controversy' is 'clea[r] and unmistakeabl[e] evidence' that the parties intended for gateway questions to be arbitrable." (citation omitted)).

The same is true for the clause's provision that "any question regarding this Agreement's existence, validity or termination" is a question for the arbitration tribunal. *See Grabowski v. PlatePass, L.L.C.*, No. 20 C 7003, 2021 WL 1962379, at *4 (N.D. Ill. May 17, 2021) (finding

clause that stated "all issues are for the arbitrator to decide, including his or her own jurisdiction, and any objections with respect to the existence, scope or validity of this Arbitration Provision" to constitute clear and unmistakable evidence of delegation); *see also Swiger v. Rosette*, 989 F.3d 501, 506 (6th Cir. 2021) (finding clause that stated "any issue concerning the validity, enforceability, or scope of this . . . Agreement to Arbitrate" to be a clear and unmistakable delegation clause); *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1209 (9th Cir. 2016) (finding, as clear and unmistakable evidence of delegation, a clause that delegated to arbitrators issues concerning "enforceability, revocability or validity of the Arbitration Provision").

Finally, the clause's incorporation of the rules of the Singapore International Arbitration Centre ("SIAC") further supports a finding of clear and unmistakable delegation. SIAC Rule 28.1 states that the SIAC Court of Arbitration has the power to resolve questions regarding, or challenges to, the "existence or validity of the arbitration agreement or to the competence of SIAC." *See* SIAC Rules 2016, SINGAPORE INTERNATIONAL ARBITRATION CENTRE (last visited Sept. 26, 2024), https://siac.org.sg/siac-rules-2016. Similarly, SIAC Rule 28.2 states that the "[t]ribunal shall have the power to rule on its own jurisdiction, including any objections with respect to the existence, validity or scope of the arbitration agreement." *Id.*

Numerous courts have found that incorporating the rules of an arbitration organization like SIAC into an arbitration clause, particularly where those rules give arbitrators the power to decide threshold issues of arbitrability, similarly constitutes a clear and unmistakable delegation of authority to the arbitrator to resolve threshold arbitrability disputes. *See Pilot Inc. v. TYC Brother Indus. Co.*, No. 2:20-CV-02978-ODW, 2020 WL 3833597, at *4 (C.D. Cal. July 8, 2020) (finding incorporation of SIAC rules was a clear and unmistakable delegation of threshold arbitrability questions to the arbitrator); *Grabowski*, 2021 WL 1962379, at *3–4 (agreeing with the "consensus

12

view among federal courts" that incorporation of AAA rules is clear and unmistakable evidence to delegate arbitrability); *Portland Gen. Elec. Co. v. Liberty Mut. Ins. Co.*, 862 F.3d 981, 985 (9th Cir. 2017) (finding clear and unmistakable delegation where agreement incorporated similar ICC rules stating that the tribunal could rule on "the existence, validity or scope of the arbitration agreement" or of the "jurisdiction"), *as amended* (Aug. 28, 2017). This is because those rules "empower[] an arbitrator to decide the gateway arbitrability issues of validity and scope of the arbitration clause" and provide that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction." *Ali v. Vehi-Ship, LLC*, No. 17 CV 02688, 2017 WL 5890876, at *3 (N.D. Ill. Nov. 27, 2017) (citing AAA Rule 7(a) as stating that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim").

Accordingly, not only does the plain text of the arbitration provision to which Plaintiffs agreed delegate threshold arbitrability issues to the arbitrators, but so too does its incorporation of the SIAC Rules. These each independently constitute clear and unmistakable delegation of authority to the arbitration tribunal to resolve threshold arbitrability disputes.

### B. Defendants' Ability to Enforce the Arbitration Agreement as Nonsignatories Is an Arbitrability Question That Is Delegated to the Arbitrator.

The question of whether Defendants, as nonsignatories, may enforce the arbitration agreement must be resolved by the arbitration tribunal given the clear and unmistakable delegation clause. *First,* that is because the question of whether a nonsignatory may compel arbitration is a question of arbitrability (i.e., whether the nonsignatory may enforce the clause), as opposed to contract formation. *Second,* that same conclusion is required by the FAA, 9 U.S.C. § 2, and case law interpreting it, which governs the interpretation of arbitration agreements. And *third,* any

13

reliance by Plaintiffs on a contrary minority view from other circuits violates Supreme Court precedent and upends the expectations of contracting parties.

> 1. *Whether nonsignatories may enforce an arbitration clause is a question of arbitrability, not contract formation, that is delegated to the arbitrator.*

Whether Defendants can enforce the Anchor TOS's agreement to arbitrate despite being nonsignatories is precisely the kind of threshold question of arbitrability that, because of the delegation clause, must be decided by an arbitration tribunal. As one court in this District already held after *Henry Schein*, "the question of whether a purported nonsignatory" to an arbitration agreement with a delegation clause "can enforce [that] arbitration agreement concerns a question of arbitrability and, thus, must be decided by the arbitrator." *Grabowski*, 2021 WL 1962379, at *4; *see also Coons v. Yum! Brands, Inc.*, 672 F. Supp. 3d 626, 635 (S.D. Ill. 2023) (finding delegation clause that stated the arbitrator could decide questions "relating to the interpretation, arbitrability, applicability, enforceability or formation of the agreement to arbitrate" to require the arbitrator to determine whether a nonsignatory could enforce the contract); *cf. Teamsters Loc. Union No. 705 v. L. Neill Cartage Co.*, No. 19-CV-07176, 2021 WL 4477888, at *6 (N.D. Ill. Sept. 30, 2021) (stating in analogous labor arbitration context that "the issue of whether the . . . Panel's awards can be enforced against a nonsignatory . . . is a question of arbitrability").

This clear holding is consistent with the Supreme Court's pronouncement that whether a party should be bound by an arbitration contract, and therefore compelled to arbitrate a given dispute, is a gateway question of "arbitrability." *See Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002). Any objection that Plaintiffs may raise to this motion seeking arbitration of their claims necessarily would raise a question of whether Defendants can enforce the arbitration agreement against Plaintiffs, as signatories to the Anchor TOS. But that is exactly the sort of question that the Supreme Court in *Howsam* found to be an exemplary "question of arbitrability."

*Id.* (stating that "a gateway dispute about whether the parties are bound by a given arbitration clause raises a question of arbitrability") (internal quotation marks omitted).  In fact, *Howsam* further suggested that questions about the rights of a nonsignatory to an arbitration contract also raise an arbitrability issue.  *Id.* (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938 (1995), which addressed "whether the arbitration contract bound parties who did not sign the agreement," as another example of an arbitrability question).[11]  Thus, while courts may resolve issues of contract formation, *see, e.g.*, *K.F.C. v. Snap Inc.*, 29 F.4th 835, 837 (7th Cir. 2022), the above cases make it clear that whether a nonsignatory can take advantage of an arbitration provision is an issue of enforcement of an arbitration clause in a contract, not contract formation.

Although there appears to be no Seventh Circuit case squarely deciding whether a nonsignatory's enforcement of an arbitration provision is a gateway question for the arbitrators if a delegation clause exists, the majority of other circuits have expressly concluded that it is.  *See Apollo Comput., Inc. v. Berg*, 886 F.2d 469, 473–74 (1st Cir. 1989) (holding that a nonsignatory's ability to enforce an arbitration agreement was for the arbitrator to decide); *Blanton v. Domino's Pizza Franchising LLC*, 962 F.3d 842, 852 (6th Cir. 2020) (holding that "the arbitrator should decide for itself whether [a nonsignatory] can enforce the arbitration agreement"); *Casa Arena Blanca LLC v. Rainwater by Est. of Green*, No. 21-2037, 2022 WL 839800, at *5 (10th Cir. Mar. 22, 2022) (holding that the district court erred in determining whether nonsignatory could enforce

---

[11] The court in *Howsam* was not asked to address whether a contractual delegation clause covered arbitrability disputes and, accordingly, noted that, ordinarily, arbitrability questions are resolved by the court.  But, importantly, *Howsam* also reaffirmed the rule that questions of arbitrability are "issue[s] for judicial determination *[u]nless the parties clearly and unmistakably provide otherwise*," such as through a delegation clause in the arbitration agreement.  *Howsam*, 537 U.S. at 83 (citation omitted) (emphasis added) (alteration in original).  Here, as noted above, there is such a delegation clause and thus arbitrability issues are to be decided by the arbitration tribunal.  *Supra* at Argument, Section I.A.

an arbitration agreement as a third-party beneficiary because, once the court determined there was a delegation clause, "it should have sent the case to arbitration"); *see also Newman v. Plains All Am. Pipeline, L.P.*, 44 F.4th 251, 253–55 (5th Cir. 2022) (Jones, J., dissenting) (observing that the Fifth Circuit's position that a *court* should decide whether a nonsignatory may enforce an arbitration agreement that contains a delegation clause was in conflict with "at least five" circuits; citing in addition *Eckert/Wordell Architects, Inc. v. FJM Props. of Willmar, LLC*, 756 F.3d 1098, 1099 (8th Cir. 2014) and *Contec Corp. v. Remote Sol. Co.*, 398 F.3d 205, 209–11 (2d Cir. 2005) as adopting the position that an arbitrator must first decide whether a nonsignatory may enforce the arbitration agreement).[12] Numerous district courts across the country have reached the same conclusion.[13]

---

[12] The Supreme Court recently confronted two petitions for writs of certiorari that highlighted this same circuit split and noted the majority view in Defendants' favor on this point. *See, e.g.*, Petition for a Writ of Certiorari, *Homeservices of Am., Inc. v. Burnett*, No. 23-840 (U.S. Feb. 2, 2024) (highlighting circuit split in which the First, Second, Third, and Sixth Circuits held the question is for the arbitrator ); *see also* Petition for a Writ of Certiorari, *Tug Hill Operating, LLC v. Rogers*, No. 23-661 (U.S. Dec. 15, 2023) (noting that five Courts of Appeals—the First, Second, Sixth, Eighth, and Tenth Circuits—leave the question to the arbitrator).

[13] *See, e.g.*, *Ford-Allemand v. Piedmont Nat. Gas Co.*, No. 1:20-CV-00192-MRB, 2022 WL 3576227, at *3 (S.D. Ohio Aug. 19, 2022) (arbitrator, not court, was required to decide whether defendant nonsignatory could enforce arbitration provision against plaintiff signatory); *Bossart v. Gen. Motors LLC*, No. 20-CV-11057, 2022 WL 3573855, at *3–4 (E.D. Mich. Aug. 19, 2022) (arbitrator was required to decide whether defendant nonsignatory could enforce arbitration provision against plaintiff signatory); *Cunningham v. Ford Motor Co.*, No. 21-CV-10781, 2022 WL 2819115, at *5–6 (E.D. Mich. July 19, 2022) (arbitrator was required to decide whether defendant nonsignatory could enforce arbitration provision against plaintiff signatory); *Williams v. Staffmark Inv. LLC*, No. 21-CV-2456-EFM-GEB, 2022 WL 910859, at *3–4 (D. Kan. Mar. 29, 2022) (arbitrator was required to decide whether defendant nonsignatory could enforce arbitration provision against plaintiff signatory as a third-party beneficiary); *Henry v. Vantage Credit Union*, No. 4:20-CV-01865-SRC, 2021 WL 2187908, at *7 (E.D. Mo. May 28, 2021) (arbitrator was required to decide whether defendant nonsignatory could enforce arbitration provision against plaintiff signatory); *In re Intuniv Antitrust Litig.*, No. 1:16-CV-12653-ADB, 2021 WL 517386, at *3–8 (D. Mass. Feb. 11, 2021) (arbitrator was required to decide whether defendant nonsignatory could enforce arbitration provision against plaintiff signatory under an equitable estoppel theory); *Symonds v. Credico (USA) LLC*, No. 1:20-CV-10192-ADB, 2020 WL 7075028, at *5–6 (D. Mass. Dec. 3, 2020) (arbitrator was required to decide whether defendant nonsignatory could enforce arbitration provision against plaintiff signatory either as a third-party beneficiary or under an equitable estoppel theory); *Robertson v. Enbridge (U.S.) Inc.*, No. 19-1080, 2020 WL 9211171, at *3–4 & *4 n.3 (W.D. Pa. Aug. 4, 2020) (arbitrator was required to decide

This Court should adopt the majority view—which, as shown above, fully comports with how the Supreme Court in *Howsam* has defined questions of arbitrability—and hold that the threshold question of whether the nonsignatory Defendants here can enforce the arbitration provision must be resolved by the arbitration tribunal given the broad delegation clause that indisputably exists in the contract and that delegates this issue to arbitration.

   2.  *Statutes and case law further support that whether a nonsignatory can enforce an arbitration provision is a question of enforceability delegated to the arbitrator, and not a question of contract formation.*

The Supreme Court has interpreted the language of Section 2 of the FAA to place arbitration provisions "upon the same footing as other contracts." *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 629–30 (2009) (citation omitted). Accordingly, the same theories that apply outside the arbitration context to determine whether a contract can be "enforced by or against" a nonsignatory similarly apply to arbitration clauses. *Id.* at 631 ("'[T]raditional principles' of state law allow a contract **to be enforced by or against nonparties** to the contract through 'assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel.'" (internal citations omitted) (emphasis added)). Thus, because a nonsignatory's ability to take advantage of a provision in a contract is generally one of

---

whether defendant nonsignatories could enforce arbitration provision against plaintiff signatory under an equitable estoppel theory) (R. & R.); *Turner v. PillPack, Inc.*, No. 5:18-CV-66-TBR, 2019 WL 2314673, at *3–6 (W.D. Ky. May 30, 2019) (pending a threshold determination that the plaintiff signatory assented to the relevant arbitration provision, arbitrator was required to decide whether defendant nonsignatory could enforce arbitration provision against plaintiff signatory either as a third-party beneficiary or "under an estoppel theory"); *De Angelis v. Icon Ent. Grp. Inc.*, 364 F. Supp. 3d 787, 794–97 (S.D. Ohio 2019) (arbitrator was required to decide whether defendant nonsignatory could enforce arbitration provision against plaintiff signatory); *Jacobsen Gravel Co. v. IronPlanet, Inc.*, No. 16-2619 (RHK/LIB), 2016 WL 10879837, at *1–4 (D. Minn. Nov. 10, 2016) (arbitrator was required to decide whether defendant nonsignatory could enforce arbitration provision against plaintiff signatory); *Visibility Corp. v. Schilling Robotics, LLC*, No. 10-12280-JGD, 2011 WL 5075816, at *1, *3–5 (D. Mass. Oct. 25, 2011) (arbitrator was required to decide whether defendant nonsignatories could enforce arbitration provision against plaintiff signatory under an assignment theory).

"enforcement," and not contract formation, that party's ability to take advantage of an arbitration provision is likewise one of "enforcement"—as numerous courts have so held. *See, e.g.*, *Swiger*, 989 F.3d at 507 ("[W]hether a nonsignatory can enforce the arbitration agreement is a question of the enforceability of the arbitration clause, as to that defendant." (internal brackets and quotation marks omitted)).

Similarly, outside the arbitration context, when deciding whether a nonsignatory may enforce an agreement, courts ask only whether that nonsignatory is permitted to enforce the contract or its terms, not whether a contract was formed with the nonsignatory in the first place. *See, e.g.*, *Ahern v. Bd. Of Educ. of City of Chi.*, 133 F.3d 975, 983 (7th Cir. 1998) (stating Illinois legal standard for third-party beneficiaries to "***enforce*** the Plan" (emphasis added)). That makes sense because a nonsignatory to any contract, by definition, is never a contracting party, yet that person may nonetheless be entitled to enforce the rights established by that contract. The fact that a nonsignatory seeks to enforce an arbitration provision does not transform that enforcement question into one of contract formation. Here, a contract was indisputably formed, and the only question is whether nonsignatories can *enforce* it. Any other conclusion would violate Section 2 of the FAA, which requires courts to treat arbitration agreements identically to other contracts.

By broadly delegating "arbitrability" disputes to the arbitrator, the Anchor TOS require that an arbitration tribunal, not the Court, decide the threshold questions of whether Defendants can enforce the arbitration agreement and whether Plaintiffs, as signatories to the arbitration agreement, are estopped from avoiding arbitration. Defendants' ability to enforce the agreement is not a contract formation question. In light of the delegation clause, this Court's role is limited to determining whether an arbitration agreement exists. Such an agreement clearly does. All

subsequent decisions are for the arbitrators, including whether Defendants are entitled to enforce arbitration under this agreement.

### 3. *The reasoning of a minority of circuit courts upends the contracting parties' expectations for delegation clauses.*

Plaintiffs will surely ask this Court to align itself with the minority of courts that have held to the contrary, including the California district court in *Patterson*, which is now on appeal. *Patterson v. Jump Trading LLC*, 710 F. Supp. 3d 692 (N.D. Cal. 2024).[14] This Court should decline to do so and instead adopt the majority rule. The minority rule is not the law of this Circuit. It also fundamentally misconceives how delegation clauses are written by asking a court to decide at the outset whether the signatories designated specific arbitrability questions to the arbitrator. *See, e.g., id.* at *7 ("But Jump's position can prevail only if there is clear and unmistakable evidence that [Plaintiff's] agreement includes an agreement to arbitrate the question of whether a third party nonsignatory to the agreement like Jump is entitled to enforce the agreement.").

Here, the delegation clause in the Anchor TOS specifically provides that "*any* claim or controversy as to arbitrability" must be resolved by arbitration. Amani Decl., Ex. A § 18 (emphasis added). This reflects the signatories' intent to give an expansive meaning to the types of arbitrability issues encompassed by that clause. *See Patel v. Garland*, 596 U.S. 328, 338 (2022) ("As this Court has repeatedly explained, the word 'any' has an expansive meaning." (internal quotation marks omitted) (citing Webster's Third New International Dictionary at 97 (defining "any" as "one or some indiscriminately of whatever kind"))).

---

[14] The California district court's decision in *Patterson* relied on *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122 (9th Cir. 2013). However, as Jump Trading explained in its pending appeal before the Ninth Circuit, the Supreme Court's ruling in *Henry Schein* abrogated *Kramer*. Appellant's Op. Br. 35–36, *Patterson v. Jump Trading, LLC*, No. 24-670, Dkt. No. 13.1 (9th Cir. May 28, 2024). Regardless, even if the district court in California was bound by erroneous Ninth Circuit precedent, this Court is not, and should instead adopt the majority view.

Moreover, courts interpret the term "arbitrability" to include all threshold questions of arbitrability, not simply ones concerning the arbitration clause's scope, i.e., whether an issue is subject to arbitration under the agreement. *See, e.g.*, *Kuznik*, 2020 WL 5983879, at *4–5 (noting that arbitrability involves "gateway matters" and rejecting argument that "'questions of arbitrability' are questions regarding the *scope*" only) (citing *Herrington v. Waterstone Mortg. Corp.*, 907 F.3d 502, 506 (7th Cir. 2018)). Where, as here, the agreement includes a broad delegation clause—stating that "*any*" arbitrability dispute must first be resolved by the arbitration tribunal—courts recognize that such a "garden-variety" clause should be construed to commit all arbitrability questions to the arbitration tribunal because "questions of arbitrability 'are typically delegated or preserved as a group,' and . . . the Supreme Court ha[s] 'spoken of questions of arbitrability as a unitary category.'" *Attix v. Carrington Mortg. Servs., LLC*, 35 F.4th 1284, 1301–02 (11th Cir. 2022) (emphasis added); *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010) ("The delegation provision is an agreement to arbitrate *threshold issues* .... [P]arties can agree to arbitrate gateway *questions of arbitrability.*" (emphases added) (internal quotation marks omitted)). The only matter excepted out of this broad formulation is one related to contract formation. But, for the reasons addressed above, whether a nonsignatory can take advantage of an arbitration provision must be considered an issue of arbitrability, not one of contract formation. *See supra* Argument, Sections I.B.1 and I.B.2.

Thus, because there is a valid arbitration agreement containing a broad delegation clause that is clear and unmistakable, this dispute must be sent to arbitration. All other questions, including whether Defendants, as nonsignatories, may enforce the arbitration provision through a theory of equitable estoppel, are questions for the arbitration tribunal (and not questions of contract formation that are left to the courts).

II.     **Even If This Court Were to Decide Whether Defendants May Compel Arbitration, Plaintiffs Should Be Equitably Estopped From Avoiding Arbitration.**

Even if the Court were to decide that the question of whether Defendants can enforce the arbitration agreement is not delegated to an arbitrator, then, on the merits of that question, this Court should find that Plaintiffs are equitably estopped under federal common law from avoiding arbitration with Defendants.

A.     **Federal Common Law Supplies the Equitable Estoppel Test.**

Federal common law, rather than state law, provides the relevant law of equitable estoppel governing whether Defendants, as nonsignatories, may enforce international arbitral agreements. The present arbitration agreement is governed by the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention") because TFL, as signatory to the contract, is not a citizen of the United States.[15]  In such cases, federal common law determines the enforceability of the arbitration provision by nonsignatories.  *See, e.g.*, *Setty v. Shrinivas Sugandhalaya LLP*, 3 F.4th 1166, 1168 (9th Cir. 2021) ("In cases involving the New York Convention, in determining the arbitrability of federal claims by or against non-signatories to an arbitration agreement, we apply 'federal substantive law,' for which we look to 'ordinary contract and agency principles.'" (internal citations omitted)); *Outokumpu Stainless USA, LLC v. Coverteam SAS*, No. 17-10944, 2022 WL 2643936, at *6 (11th Cir. July 8, 2022) (Tjoflat, J., concurring) (noting that federal law applies to disputed questions regarding enforcement of

---

[15] The New York Convention and its implementing legislation govern the enforcement and recognition of "an arbitration agreement or arbitral award arising out of a legal relationship" that is considered as commercial and, as a general matter, not "entirely between citizens of the United States."  *See* 9 U.S.C. § 202.  Here, the Anchor TOS are a commercial agreement between TFL, a company incorporated, and with its principal place of business, in Singapore, *see* Mot. to Dismiss and Compel at 18, *Patterson v. Terraform Labs, Pte. Ltd.*, No. 5:22-cv-03600, Dkt. No. 122 (N.D. Cal. May 8, 2023), and Plaintiffs, all United States citizens, *see* Am. Compl. ¶¶ 12–15.  Therefore, the New York Convention and its implementing legislation under the Federal Arbitration Act, *see* 9 U.S.C. § 201 *et seq.*, apply.

international arbitral agreements by nonsignatories because there is a "uniquely federal interest" in this issue and "allowing each state or international law to impose its own test for threshold questions of arbitrability would create an unmanageable tangle of arbitration law in the United States"); *see also Boyle v. United Techs. Corp.*, 487 U.S. 500, 507 (1988) (holding that federal law should apply if there is a federal interest and state law would frustrate that interest); *Certain Underwriters at Lloyd's London v. Argonaut Ins. Co.*, 500 F.3d 571, 581 (7th Cir. 2007) (finding federal common law applied to interpretation of international arbitral agreements and stating, "[i]n sum, the substantial federal interests in uniform interpretation of agreements under the [New York] Convention justify the application of a uniform rule of decision on the question presented").

Thus, federal common law governs the determination of whether Plaintiffs are equitably estopped from avoiding arbitration with Defendants.

### B. Defendants May Invoke Equitable Estoppel to Compel Arbitration of This Dispute.

Under federal common law principles of equitable estoppel, Plaintiffs must arbitrate their dispute because they allege that Defendants engaged in interdependent and concerted misconduct with TFL, a signatory to the arbitration agreement—indeed, that theory pervades the Amended Complaint. The law does not permit Plaintiffs, as signatories to an arbitration agreement, to avoid arbitration by suing nonsignatories allegedly liable for scheming with the very same signatories whom Plaintiffs have strategically elected not to sue.

Equitable estoppel applies under federal law in either of two scenarios: (1) when the claims rely on the terms of the contract or (2) when the claims arise out of allegations of interdependent and concerted misconduct between a signatory and a nonsignatory. *Sosa v. Onfido, Inc.*, 8 F.4th 631, 641–42 (7th Cir. 2021) (recognizing this as the "federal standard"); *Leff v. Deutsche Bank AG*, No. 08-CV-733, 2009 WL 1380819, at *5 (N.D. Ill. May 14, 2009) (collecting cases); *see also*

*Llagas v. Sealift Holdings, Inc.*, No. 23-30047, 2023 WL 8613607, at *3 (5th Cir. Dec. 13, 2023) (citing *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524 (5th Cir. 2000)); *cf. Bufkin Enters., L.L.C. v. Indian Harbor Ins. Co.*, 96 F.4th 726, 731 n.4 (5th Cir. 2024) (noting that even the existence of only the second scenario would be sufficient to compel arbitration).

Courts in this District have repeatedly held that equitable estoppel under federal common law applies where a plaintiff alleges that the nonsignatory defendant entered into a scheme with a signatory. *See, e.g.*, *Leff*, 2009 WL 1380819, at *5 (finding equitable estoppel applied where "Plaintiffs' claims are premised on the theory that Deutsche Bank and others, including Counterpoint and Delta, entered into a conspiracy and/or engaged in a scheme to develop and market 'illegal' tax strategies"); *see also Holden v. Deloitte & Touche LLP*, 390 F. Supp. 2d 752, 764–67 (N.D. Ill. 2005) (applying federal law to find arbitration was properly compelled under "concerted misconduct" theory where the complaint alleged all defendants' conduct shared the central goal of "effectuation of the S[tock] P[urchase] A[greement]"); *Hoffman v. Deloitte & Touche*, LLP, 143 F. Supp. 2d 995, 1005 (N.D. Ill. 2001) (compelling arbitration with nonsignatories and stating that "plaintiffs claim that all the defendants conspired to induce them to participate in the roll-up . . . . The claims thus raise allegations of substantially interdependent and concerted misconduct by both the signatory (EPS) and the non-signatories.").

Accordingly, Plaintiffs must be compelled to arbitrate. The entire thrust of the Amended Complaint is that Defendants entered into a "scheme" with TFL and aided and abetted TFL in manipulating the price of commodities. Am. Compl. ¶¶ 1, 4, 74, 103, 156, 163, 170, 175–77. Underscoring the centrality of such allegations, Plaintiffs open their Amended Complaint with the assertion that "Defendants schemed with [Kwon and TFL] to manipulate the market price for UST and to conceal their manipulation." *Id.* ¶ 1. As noted, Plaintiffs then continuously claim that TFL

23

and Kwon schemed with Defendants to prop up the price of UST. *See*, *e.g.*, *id.* ¶¶ 4, 74, 156. They allege that TFL and Kwon did so by incentivizing Defendants with a secret agreement and that Defendants then intervened pursuant to this joint scheme to purchase UST to restore its peg to $1. *See id.* ¶¶ 5, 7, 57, 163, 177. Plaintiffs then claim that Defendants worked with TFL and Kwon to hide their purported scheme. *See id.* ¶¶ 7, 86, 96, 99, 170, 175. Plaintiffs point to statements that purportedly hid the alleged restoration of UST's peg to $1 from the public, and, in fact, attribute these statements interchangeably (and improperly) among certain Defendants, TFL, and Kwon. *See, e.g.*, *id.* ¶¶ 86–88, 93, 94, 96–103. Plaintiffs also explicitly state that Defendants "aided and abetted" TFL's alleged fraud and expressly assert a claim against Defendants for the same. *See id.* ¶¶ 6, 7, 170, 175.

The Amended Complaint thus alleges, and Plaintiffs' theory of the case relies upon, substantially interdependent and concerted misconduct between Defendants (nonsignatories) and TFL (a signatory). Had Plaintiffs sued TFL, their claims would have been sent to arbitration. In such circumstances, federal principles of equitable estoppel preclude Plaintiffs from avoiding arbitration of their claims against Defendants.[16]

---

[16] Although the California district court in *Patterson* found that plaintiffs in that case were not estopped from avoiding arbitration of their claims against Jump Trading, the court based its decision on the erroneous conclusion that the Ninth Circuit does not recognize "concerted misconduct" as a ground to apply equitable estoppel. *Patterson*, 710 F. Supp. 3d at 709. Other courts in the Ninth Circuit have held that the Ninth Circuit's standard for equitable estoppel "is satisfied where a signatory 'raises allegations of collusive misconduct between the nonsignatory and other signatories.'" *Am. Chung Nam, LLC v. Mitsui O.S.K. Lines, Ltd.*, No. 2:23-CV-07676-SB-JPR, 2023 WL 8845213, at *8 (C.D. Cal. Dec. 19, 2023) (citation omitted); *MouseBelt Labs Pte. Ltd. v. Armstrong*, 674 F. Supp. 3d 728, 742 (N.D. Cal. 2023) (same). In any event, as noted above, the Seventh Circuit has recognized expressly that, under federal common law, "equitable estoppel may apply to enforce an arbitration provision where (1) the signatory references to or presumes the existence of a written agreement in asserting its claims against a non-signatory, or (2) the signatory raises allegations of substantially interdependent and concerted misconduct by both the non-signatory and one or more signatories to the contract." *Sosa*, 8 F.4th at 641–42 (internal quotation marks and citation omitted).

### III.     This Dispute Falls Within the Scope of the Anchor TOS's Broad Arbitration Clause.

If the Court first determines that it should decide whether Defendants can enforce the agreement (though, for the reasons set forth above, it should not), and then finds that federal law equitably estops Plaintiffs from avoiding arbitration, that ends the matter, because the delegation clause requires an arbitrator to determine whether Plaintiffs' claims fall within the scope of the arbitration provision.[17]  But even were this Court to independently analyze the separate textual issue of whether Plaintiffs' claims fall within the express scope of the arbitration clause, the Court should conclude that this dispute is subject to the arbitration provision.

The arbitration clause here applies to "[a]ny claim or controversy arising out of or relating to" certain subjects.  Amani Decl., Ex. A § 18.  The terms "arising out of" and "relating to" indicate an "extremely broad" arbitration clause "capable of an expansive reach."  *Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.*, 174 F.3d 907, 909–10 (7th Cir. 1999).  In fact, broad clauses such as this "necessarily create a presumption of arbitrability."  *Id.*  Accordingly, courts in this Circuit routinely interpret such clauses as "encompassing claims even tangentially related to the agreements."  *Patterson 357, LLC v. Heidelberg Materials Midwest Agg, Inc.*, No. 23-CV-02831, 2024 WL 1301331, at *5 (N.D. Ill. Mar. 27, 2024) (citing *Gore v. Alltel Commc'ns, LLC*, 666 F.3d 1027, 1036 (7th Cir. 2012)).  Here, the broad arbitration clause at issue requires that Plaintiffs'

---

[17] That is because any further question about whether the specific claims that Plaintiffs bring against Defendants fall within the scope of the arbitration clause are left to the arbitrator given the broad delegation clause in the contract.  *See Henry Schein*, 586 U.S. at 68 ("When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract.  In those circumstances, a court possesses no power to decide the arbitrability issue."); *see also Wilhelm v. BAM Trading Servs., Inc.*, No. 23 CV 14906, 2024 WL 2274326, at *3 (N.D. Ill. May 20, 2024) ("Through a delegation clause, parties may manifest such clear and unmistakable intent 'to have an arbitrator decide . . . gateway questions of arbitrability, such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy.'" (citation omitted)); *see also supra* Argument, Section I.

claims be sent to arbitration because the underlying factual allegations more than tangentially relate to the subjects that the Anchor TOS state must be arbitrated.

The Anchor TOS's arbitration clause explicitly covers the claims at issue here because it includes an agreement to arbitrate "[a]ny claim or controversy arising out of or relating to . . . any other acts or omissions for which [Plaintiffs] *may contend* that [TFL] [is] liable." *See* Amani Decl., Ex. A § 18 (emphasis added). Here, the dispute—asserting that Defendants and TFL jointly concocted a scheme to deceive alleged investors—is certainly about conduct for which Plaintiffs "may contend" that TFL is liable. Indeed, Plaintiffs' aiding and abetting claim against Defendants requires, *inter alia*, that they prove TFL committed a primary violation of the commodities laws. *See Damato v. Hermanson*, 153 F.3d 464, 470 (7th Cir. 1998) (concerning the Commodities Exchange Act, stating, "[b]y definition, an aider and abettor knowingly contributes to the principal's violation, rather than committing an independent violation of its own"); *Tatum v. Legg Mason Wood Walker, Inc*., 83 F.3d 121, 123 n.3 (5th Cir. 1996) ("In order to recover damages from a secondary party in an action for 'aiding and abetting' liability under the Commodities Exchange Act, a plaintiff must first prove that a primary party committed a commodities violation.")[18]

Plaintiffs' claims are also independently covered by the arbitration provision because they "aris[e] out of or relat[e] to the Interface [or] this Agreement," i.e., the Anchor Protocol or the Anchor TOS (*see* Amani Decl., Ex. A Preamble), both because Plaintiffs' claims relate to their use of the Anchor Protocol and because deciding such claims requires interpreting provisions of the Anchor TOS.

---

[18] Indeed, Plaintiffs allege in the Amended Complaint that the SEC sued TFL for the same alleged misconduct on which Plaintiffs base their claims, namely alleged collusion with Defendants "to restore UST's artificial $1 peg." Am. Compl. ¶ 9.

With respect to the Anchor Protocol, the harm that Plaintiffs claim they suffered is related to and arises out of their use of the Anchor Protocol. As noted, Plaintiffs allege that over 95% of their "UST losses are attributable to UST tokens that [they] loaned to the 'Anchor Protocol.'" Am. Compl. ¶ 130.[19] Plaintiffs attempt to distance their claims from the Anchor Protocol by averring that they are not seeking to recover in this action "any decrease in the value of aUST or any expected returns from lending UST through the Anchor Protocol." Am. Compl. ¶ 131. In that regard, Plaintiffs apparently indicate that they are willing to forego using the decline in aUST's value as a basis for calculating their damages. To the extent that "concession" even makes sense, Plaintiffs' other allegations still show that the Anchor Protocol is central to their case, as they allege elsewhere that they "loaned [the majority of their UST tokens] to the 'Anchor Protocol'" and that "approximately three-quarters of all UST holdings were held in such manner by the Class." Am. Compl. ¶ 130. Thus, as alleged, most of Plaintiffs' UST holdings that lost value, and for which Plaintiffs are seeking damages, were UST that Plaintiffs deposited into the Anchor Protocol, via their use of the Interface. Am. Compl. ¶ 130. Therefore, Plaintiffs' claims certainly "arise out of and relate to" the Interface through which market participants accessed the Anchor Protocol.

Plaintiffs' claims also relate to the Anchor TOS because the Anchor TOS may limit, or otherwise impact, Plaintiffs' ability to prevail on their claims. *See* Amani Decl., Ex. A. For instance, Plaintiffs presumably will contend in this case that their decision to buy UST and loan it to the Anchor Protocol was based, at least in part, on the purported promise that the Anchor deposits would yield a 20% interest rate, as Kim alleged in the original Complaint. Compl. ¶ 73. But, in subscribing to the Anchor TOS, Plaintiffs agreed that the 20% interest rate was "not a

---

[19] In his original Complaint, Plaintiff Kim alleged that he exchanged over 95.7% of his UST holdings for aUST using the Anchor Protocol. Compl. ¶¶ 83–84.

27

promise" or "guarantee" and was "a forward-looking projection based on a good faith belief of how to reasonably project results over the relevant period . . . subject to numerous assumptions, risks and uncertainties." *See* Amani Decl., Ex. A § 10. By subscribing to the Anchor TOS, Plaintiffs also accepted the risk of a declining value in their tokens—having been warned that the purchase of UST tokens could be affected by "technology" or "speculation," *see id.* at § 14—and were explicitly told that "you may still suffer a financial loss in fiat-denominated terms if the fiat-denominated value of the relevant tokens . . . declines during the deposit period." *Id.* at § 10. That means that litigating Plaintiffs' claims—including their core claim that they suffered damages from a decline in UST's value that they had no reason to anticipate—will require interpreting the terms of the Anchor TOS.

Additionally, Plaintiffs' allegations place at issue whether, after depositing their UST into the Anchor Protocol and receiving aUST in exchange for those deposits, Plaintiffs maintained title to the underlying UST deposits on which Plaintiffs purport to base their damages. Am. Compl. ¶ 130 (alleging that "[t]itle to all UST loaned to the Anchor Protocol remained with the named Plaintiff at all times, including while the UST tokens were loaned through the Anchor Protocol . . . ."); *see also id.* ¶¶ 121, 123, 125, 127. Resolution of that issue implicates certain terms in the Anchor TOS, such as whether the Interface acted as the owner or custodian of the UST deposits in the Anchor. Amani Decl., Ex. A § 23.

In short, although an arbitration tribunal should determine whether Plaintiffs' claims fall within the scope of the arbitration provision given the delegation clause, if the Court takes up the question itself, the Court should conclude that the claims fall within the arbitration clause's broad scope.

**IV.    If the Court Compels Arbitration of Only Some of Plaintiffs' Claims, Any Remaining Claims Should Be Stayed.**

If the Court were to itself determine the arbitrability questions and find that some, but not all, of Plaintiffs' claims should be arbitrated, it should exercise its discretion to stay the nonarbitrable claims pending resolution of the arbitration to avoid inconsistent rulings and to potentially narrow the issues. *See Volkswagen of Am., Inc. v. Sud's of Peoria, Inc.*, 474 F.3d 966, 972 (7th Cir. 2007) ("The factors that bear on this inquiry include 'the risk of inconsistent rulings, the extent to which parties will be bound by the arbitrators' decision, and the prejudice that may result from delays . . . [D]istrict courts actually may prefer to stay the balance of the case in the hope that the arbitration might help resolve, or at least shed some light on, the issues remaining in federal court." (internal citation omitted)).

In particular, the arbitration tribunal will have to decide many factual issues that overlap with any nonarbitrable claim.  For example, each of Plaintiffs' three claims—for commodities manipulation, aiding and abetting, and unjust enrichment—requires finding that the price of the alleged underlying commodity was manipulated, with Defendants' knowledge, or that Defendants, TFL, or Kwon made materially misleading statements.  They would also require proof that Plaintiffs were harmed by the alleged conduct.[20]  Thus, while the Court should compel arbitration as to all claims, in the event that it compels arbitration of only some of them, staying the nonarbitrable claims would promote judicial economy and the efficient conduct of the proceedings.

## <u>CONCLUSION</u>

For the reasons stated above, Defendants respectfully request that this Court compel arbitration of Plaintiffs' claims and stay any remaining claims not sent to arbitration.

---

[20] Further, as explained in Jump Trading's and Kariya's motion to dismiss the original Complaint, Plaintiffs' unjust enrichment claim "will stand or fall with the related claim."  *See* Dkt. No. 56 at 25.

29

Dated:     September 26, 2024

Respectfully submitted,

ZUCKERMAN SPAEDER LLP

/s/ R. Miles Clark

R. Miles Clark (admitted *pro hac vice*)
Aitan Goelman (admitted *pro hac vice*)
Christopher R. MacColl (admitted *pro hac vice*)
1800 M Street, NW, Suite 1000
Washington, DC 20036
Telephone: (212) 778-1800
agoelman@zuckerman.com
mclark@zuckerman.com
cmaccoll@zuckerman.com

Michael Frisch (Bar No. 6296533)
CROKE FAIRCHILD DUARTE & BERES
180 N. LaSalle St., Suite 3400
Chicago, IL 60601
Telephone: (847) 530-7419
mfrisch@crokefairchild.com

*Attorneys for Defendant Kanav Kariya*

KRIEGER LEWIN LLP

/s/ Paul M. Krieger

Paul M. Krieger (admitted *pro hac vice*)
Jonathan F. Bolz (admitted *pro hac vice*)
Andrew N. Stahl (admitted *pro hac vice*)
350 Fifth Avenue, 77th Floor
New York, NY 10118
Telephone: (212) 390-9550
Paul.Krieger@KriegerLewin.com
Jonathan.Bolz@KriegerLewin.com
Andrew.Stahl@KriegerLewin.com

*Attorneys for Defendant William DiSomma*

KOBRE & KIM LLP

/s/ Jonathan D. Cogan

Jonathan D. Cogan
Steven W. Perlstein (admitted *pro hac vice*)
Igor Margulyan (admitted *pro hac vice*)
800 Third Avenue
New York, NY 10022
Telephone: (212) 488-1200
steven.perlstein@kobrekim.com
jonathan.cogan@kobrekim.com
igor.margulyan@kobrekim.com

Erika L. Berman (admitted *pro hac vice*)
1919 M Street, NW
Washington, DC 20036
Telephone: (202) 664-1900
erika.berman@kobrekim.com

*Attorneys for Defendants Jump Trading, LLC and Jump Crypto Holdings LLC*