IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TAEWOO KIM, KASHYAP PATEL, KERRY WOOLLEY, and KEN WORSHAM, *individually and on behalf of all others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>JUMP TRADING, LLC, JUMP CRYPTO HOLDINGS, LLC (f/k/a 1HOLD1 LLC), KANAV KARIYA, and WILLIAM DISOMMA,<br><br>Defendants. | Case No. 23 CV 2921<br><br>Hon. Georgia N. Alexakis |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Taewoo Kim, Kashyap Patel, Kerry Woolley, and Ken Worsham bring this suit individually and on behalf of a putative class against Jump Trading, LLC, its cryptocurrency arm Jump Crypto Holdings, LLC, and two of Jump Crypto's executives. They allege that defendants violated state and federal law by scheming with Terraform Labs Pte. Ltd. ("TFL") to manipulate the price of a stablecoin called TerraUSD ("UST"). Defendants now move to compel arbitration pursuant to an agreement plaintiffs signed with TFL. For the reasons set forth below, the Court denies defendants' motion.

### LEGAL STANDARD

The Federal Arbitration Act ("FAA") governs the enforceability, validity, and interpretation of commercial contracts involving interstate commerce. *See* 9 U.S.C.

§ 1 *et seq.*; *see also Jain v. de Mere*, 51 F.3d 686, 688 (7th Cir. 1995). Under the FAA, arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA reflects a "liberal federal policy favoring arbitration and the fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (internal citations omitted).

Because arbitration is a matter of contract, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (quoting *Steelworkers v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960)). Before ordering arbitration, it is a court's role to determine whether a valid contract exists. *See Janiga v. Questar Capital Corp.*, 615 F.3d 735, 742 (7th Cir. 2010). At the same time, "parties may agree to have an arbitrator decide not only the merits of a particular dispute but also 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 68 (2019) (citing *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010)). When parties agree to arbitrate arbitrability, a court may not disregard this "additional, antecedent agreement," even when the argument for arbitration appears "wholly groundless." *Id.* at 68–72.

To determine whether parties have agreed to arbitrate questions of arbitrability, there must be "clear and unmistakable evidence that they did so." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (cleaned up) (quoting *AT&T*

*Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)). The party seeking to compel arbitration bears the burden of showing arbitration is the appropriate venue. *See A.D. v. Credit One Bank, NA*, 885 F.3d 1054, 1063 (7th Cir. 2018).

## FACTUAL BACKGROUND[1]

In 2018, Do Kwon and his company TFL began creating the Terra blockchain. [60] ¶ 43. The next year, TFL began to sell UST and its related digital asset, LUNA. *Id.* ¶¶ 2, 43, 47. LUNA was the native token of the Terra blockchain. *Id.* ¶ 43. UST, by contrast, was designed as a "stablecoin," a type of digital asset intended to be more stable than other cryptocurrencies by pegging its value to another asset. *Id.* ¶¶ 2, 38, 45. UST was continuously pegged to the U.S. dollar, which, according to plaintiffs, was meant "to appeal to the public as a safe crypto asset to serve as a store of value and medium of exchange." *Id.* ¶ 2; *see also id.* ¶ 44. However, instead of being backed by actual dollars, TFL maintained UST's price by minting and burning UST in parallel with LUNA. *Id.* ¶ 45; *see also id.* ¶ 38 (describing "one of two ways" that "a stablecoin's peg can be maintained").

Jump Crypto was one of TFL's early partners. *Id.* ¶¶ 3, 48. From November 2019 to September 2020, it entered into a series of agreements with TFL to borrow tens of millions of LUNA tokens and provide "market-making" services to TFL in exchange for the opportunity to buy discounted LUNA tokens. *Id.* ¶¶ 3, 50–57. In May

---

[1] Resolving this motion does not require a thorough recounting of the underlying facts, but to provide some context for the parties' dispute, the Court sets out key allegations from plaintiffs' amended complaint. The Court accepts those allegations as true only for purposes of this motion.

2021, TFL's algorithm pegging UST to $1 failed, and UST's market price fell. *Id.* ¶¶ 4, 73.

In response, plaintiffs contend TFL and Kwon "secretly schemed with Defendants to manipulate and pump the market price for UST by making secret, coordinated trades to prop up UST to its $1 peg." *Id.* ¶ 4. As part of this scheme, plaintiffs further contend, Jump[2] bought more than 62 million UST tokens in May 2021, which "artificially inflate[d]" UST's price to $1 and "caus[ed] a corresponding rise in the price of UST." *Id.* To reward Jump for this alleged manipulation of the UST market, "Kwon agreed to modify TFL's prior agreements with Jump and instead unconditionally sell 65 million LUNA tokens to Jump at a greater than 99% discount from their then-current market price." *Id.* ¶ 5, *see also id.* ¶¶ 77–79, 105. Plaintiffs say Jump later sold these LUNA tokens for a $1.28 billion profit. *Id.* ¶¶ 5, 84, 106.

According to plaintiffs, defendants "actively concealed and aided and abetted TFL's and Kwon's concealment of Jump's May 2021 intervention to maintain the artificial $1 peg for UST." *Id.* ¶ 7; *see also id.* ¶¶ 111–14. By May 2022, the price of UST collapsed entirely, causing an alleged loss of nearly $19 billion in UST holdings, including a loss of more than $2 million in UST for the four named plaintiffs. *Id.* ¶¶ 7–8, 109. Plaintiffs maintain that, as a whole, the class sustained "billions of dollars in actual damages under applicable law." *Id.* ¶¶ 8, 128.

In May 2023, Kim brought a putative class action complaint against Jump Trading and Kanav Kariya, the president of Jump Crypto, alleging violations of the

---

[2] As plaintiffs do in their amended complaint, the Court uses "Jump" here to refer collectively to defendants Jump Trading, LLC, and Jump Crypto. [60] at 1.

Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 *et seq.*, Commodity Futures Trading Commission ("CFTC") regulations, 17 C.F.R. § 180, and common law unjust enrichment. *See generally* [1]. In August 2024, plaintiffs brought an amended class action complaint adding Patel, Woolley, and Worsham as plaintiffs and Jump Crypto and William DiSomma—co-founder and co-owner of Jump Trading—as defendants. *See generally* [60]; *see also id.* ¶ 19.

The next month, defendants moved to compel arbitration under an agreement to arbitrate between plaintiffs and TFL. [82]. The operative agreement to which defendants point appears in the terms of service for the "Anchor Protocol," which is a feature of the Terraform blockchain. *See generally* [83-1] at Ex. A.[3] Although defendants were not a party to the Anchor Protocol's terms of service, they nonetheless contend that equitable estoppel principles require plaintiffs to submit this dispute to arbitration.

---

[3] The Anchor Protocol is a "'savings protocol' created by TFL that permitted users to lend their UST to borrowers at an interest rate through a self-described 'money market' established by TFL." [60] ¶ 130; *see also id.* ¶ 29. Plaintiffs' original complaint stated that of the nearly 19 billion UST tokens in circulation, 14 billion were deposited in the Anchor Protocol. [1] ¶ 72. The original complaint also specified that Kim, the only named plaintiff at that time, completed various transactions via the Anchor Protocol. *Id.* ¶¶ 83–84. Based on their amended complaint, plaintiffs disclaim any effort to recover losses "relat[ing] to the failure of the Anchor Protocol," although Plaintiffs still assert that their claims remain based "on the devaluation of their UST," including "UST over which the Plaintiffs retained title but that they had loaned to the Anchor Protocol." [84] at 4; *see also* [60] ¶¶ 129–31. To support their motion to compel—and, more specifically, to establish that plaintiffs are bound by the Anchor Protocol's terms of service—defendants rely on a declaration from Arrash Chris Amani, TFL's former Chief Operating Officer and Chief Financial Officer. *See generally* [83-1]. In his declaration, Amani describes how prospective Anchor Protocol users were required to accept its terms of service, including its "mandatory agreement to arbitrate all disputes with TFL." *Id.* ¶ 5. Plaintiffs argue that Amani's declaration constitutes inadmissible evidence and that, as a result, defendants cannot establish that plaintiffs are bound by the Anchor Protocol's terms of service. [84] at 5–7. Because it denies defendants' motion on other grounds, the Court does not address the parties' dispute over the admissibility of Amani's declaration. Plaintiffs otherwise do not contend that the delegation-clause language that appears in the Anchor Protocol's terms of service, *see infra*, is inaccurate.

5

**DISCUSSION**

Defendants' motion to compel presents three issues: (1) whether the Court or the arbitrator should determine if plaintiffs' claims are arbitrable given defendants' status as non-signatories to the Anchor Protocol's terms of service; (2) assuming that predicate determination is one for the Court, whether it should apply equitable estoppel principles from state law or federal common law to determine whether non-signatory defendants can compel arbitration against plaintiffs; and (3) again assuming that the Court should decide the predicate question, whether defendants actually may compel arbitration under equitable estoppel principles. The Court considers each issue in turn.

**A. Courts Decide Whether Non-Signatories Can Compel Arbitration.**

The parties first dispute whether the Court or an arbitrator should decide if defendants, as non-signatories to the Anchor Protocol's terms of service, can compel arbitration pursuant to plaintiffs' agreement with TFL. Defendants argue that the arbitrator should decide the question because the "Anchor [terms of service] include a broad arbitration clause as well as a clear and unmistakable delegation clause." [82] at 1–2. Plaintiffs maintain that this question is one for the Court.

Neither party disputes that the Anchor Protocol's terms of service delegate arbitrability questions to the arbitrator. The relevant provision reads:

> Any claim or controversy arising out of or relating to the Interface, this Agreement, including any question regarding this Agreement's existence, validity or termination, or any other acts or omissions for which you may contend that we[4] are liable, including (but not limited to) any claim or controversy as to arbitrability ("Dispute"), shall be

---

[4] The terms of service define "we" as "Terraform Labs PTE, Ltd." [83-1] at 6.

6

> referred to and finally resolved by arbitration in Singapore in accordance with the Arbitration Rules of the Singapore International Arbitration Centre ("SIAC Rules")[.]
>
> You understand that you are required to resolve all Disputes by binding arbitration. The arbitration shall be held on a confidential basis before one or three arbitrators, who shall be selected pursuant to SIAC Rules. The seat of the arbitration shall be determined by the arbitrator(s); the arbitral proceedings shall be conducted in English. The applicable law shall be Singapore law.

[83-1] at 12. Because this provision clearly delegates "any claim or controversy as to arbitrability" to an arbitrator, the Court agrees with defendants that this provision contains the sort of clear and unmistakable intent ordinarily required to delegate questions of arbitrability to an arbitrator. *See First Options*, 514 U.S. at 944; *see also Henry Schein*, 586 U.S. at 68 (parties may agree to delegate arbitrability questions to arbitrator). If plaintiffs were suing TFL, this provision would go a long way toward resolving a motion to compel arbitration. But plaintiffs are not suing TFL, and Jump and the other defendants in this matter were not parties to the contract between plaintiffs and TFL.

As another court in this district already has observed, that defendants are non-signatories attempting to enforce the arbitration agreement "presents a logical conundrum." *O'Connor v. Ford Motor Co.*, No. 19-CV-5045, 2023 WL 130522, at *5 (N.D. Ill. Jan. 9, 2023) (cleaned up). Before compelling arbitration, it is the province of a court to determine "whether a contract exists at all." *Id.* (quoting *Swiger v. Rosette*, 989 F.3d 501, 507 (6th Cir. 2021)). If "the nonsignatories are not parties to the contract, then the Plaintiff has no agreement with them," and even the broadest of delegation clauses does not apply. *Id.* (quoting *Swiger*, 989 F.3d at 507). At the

7

same time, whether an arbitration agreement can be used to compel arbitration by a non-signatory defendant "is a question of the enforceability of the arbitration clause, as to that defendant." *Id.* (quoting *Swiger*, 989 F.3d at 507). And, because the Anchor Protocol's terms of service clearly delegate "*any* claim or controversy as to arbitrability," this seems at first glance like a question for the arbitrator. [83-1] at 12 (emphasis added).

Both things cannot be true. "Given this logical conundrum, it is not surprising that there is some inconsistency in the federal case law concerning who—the court or the arbitrator—decides a challenge to a non-signatory's standing to demand arbitration." *O'Connor*, 2023 WL 130522, at *5. Some circuits have held that whether a third party can compel arbitration under a plaintiff's arbitration agreement with another party is a question of enforceability for the arbitrator (assuming, of course, that there is a clear and unmistakable intent to delegate questions of arbitrability). *See, e.g.*, *Apollo Computer, Inc. v. Berg*, 886 F.2d 469, 473 (1st Cir. 1989).[5] Other circuits, meanwhile, view a non-signatory's ability to enforce an arbitration

---

[5] *See also Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 211 (2d Cir. 2005) (third-party's right to enforce arbitration agreement "is a matter of the Agreement's continued existence, validity and scope, and is therefore subject to arbitration under the terms of the arbitration clause"); *Blanton v. Domino's Pizza Franchising LLC*, 962 F.3d 842, 852 (6th Cir. 2020) ("[T]he arbitrator should decide for itself whether [non-signatory] can enforce the arbitration agreement."); *Eckert/Wordell Archs., Inc. v. FJM Props. of Willmar, LLC*, 756 F.3d 1098, 1100 (8th Cir. 2014) ("Whether a particular arbitration provision may be used to compel arbitration between a signatory and a nonsignatory is a threshold question of arbitrability."); *Casa Arena Blanca LLC v. Rainwater by Est. of Green*, No. 21-2037, 2022 WL 839800, at *5 (10th Cir. Mar. 22, 2022) ("[T]he question of whether the Agreement should be enforced against Ms. Rainwater as a third-party beneficiary of that contract is one that should be decided by an arbitrator.").

agreement as a question of contract formation for courts. *See, e.g., Rogers v. Tug Hill Operating, LLC*, 76 F.4th 279, 288 (4th Cir. 2023).[6]

The Seventh Circuit's opinion in *CCC Intelligent Solutions Inc. v. Tractable Inc.*, 36 F.4th 721, 723 (7th Cir. 2022), provides a way out of this conundrum. There, one of Tractable's employees entered into a contract with CCC Intelligent Solutions ("CCC") to access CCC's software and incorporate some of its algorithms into Tractable's product. *Id.* at 722–23. To conceal his association with Tractable, however, the employee entered into the contract using a false name—"JA Appraisal"—and provided false contact information. *Id.* at 722. When CCC sued Tractable, Tractable moved to compel arbitration pursuant to the contract between JA Appraisal and CCC. *See CCC Info. Servs. Inc. v. Tractable Inc.*, No. 18 C 7246, 2019 WL 2011092, at *1 (N.D. Ill. May 7, 2019). The district court held that the "dispute—whether plaintiff agreed to arbitrate with *Tractable*—[was] a dispute that can't logically be resolved by the arbitrators" because "the delegation clause cannot be enforced against plaintiff unless plaintiff agreed to arbitrate disputes with Tractable." *Id.* at *2 (cleaned up) (emphasis added). It further reasoned: "[T]he issue is not the effect of a contractual provision to which the parties agreed. … The issue is whether an agreement between plaintiff and Tractable exists at all," and thus it was an issue "for the court to decide." *Id.* The district court in *CCC* went on to conclude

---

[6] *See also Newman v. Plains All Am. Pipeline, L.P.*, 23 F.4th 393, 398 (5th Cir. 2022) ("When a court decides whether an arbitration agreement exists, it necessarily decides its enforceability between parties. Therefore, deciding an arbitration agreement's enforceability between parties remains a question for courts."); *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1127 (9th Cir. 2013) ("Given the absence of clear and unmistakable evidence that Plaintiffs agreed to arbitrate arbitrability with nonsignatories, the district court had the authority to decide whether the instant dispute is arbitrable.").

9

that Tractable was not a party to the arbitration agreement and that it could not enforce the agreement under any theory of agency or equitable estoppel. *Id.* at \*3–\*4.

The Seventh Circuit affirmed. Although its analysis focused on the latter dispute (whether Tractable could enforce the agreement), the appeals court described the district court as having "appl[ied] the rule that a judge must decide whether the parties have agreed to arbitrate." *CCC*, 36 F.4th at 723 (citing *AT&T Techs.*, 475 U.S. at 643). It then affirmed the district court's subsequent conclusion that Tractable was not a party to (or beneficiary of) the contract between CCC and JA Appraisal. *Id.* at 724 ("The potential exception for third-party beneficiaries does not apply, which leaves the dominant rule. Tractable is not a party to this contract, so it cannot demand arbitration."). Even though the Seventh Circuit never explicitly addressed who should decide whether Tractable could enforce the contract, its answer was implicit in its approving description of the district court's approach to resolving Tractable's motion to compel.

Defendants contend that *CCC* is inapposite because "the appellant … argued that it could compel arbitration, not as a nonsignatory, but as the real party to the contract." [91] at 6. To be sure, the Seventh Circuit did focus its analysis on whether Tractable was a party to a contract signed by the non-existent "JA Appraisal." *CCC*, 36 F.4th at 723–24. But after it determined Tractable was not, in effect, a signatory, the appeals court also remarked that "[t]he potential exception for third-party beneficiaries [did] not apply" to enable Tractable to enforce the contract against CCC. *Id.* at 724. This statement went beyond whether Tractable itself was a party to the

10

contract; the court addressed whether Tractable could rely on an equitable doctrine to bind plaintiffs nonetheless. As a result, defendants' efforts to cast *CCC* in exceedingly narrow terms—as one focused purely on "contract formation rather than enforcement"—are less than convincing. [91] at 6. In any event, the underlying district court opinion unambiguously held that a court should decide whether Tractable as a non-signatory could compel arbitration under principles of agency and equitable estoppel. *See CCC*, 2019 WL 2011092, at *3–*4. And again, on appeal, the Seventh Circuit did not take any issue with the district court's approach. *See CCC*, 36 F.4th at 724.

Since the appeals court decision in *CCC*, district courts throughout the Seventh Circuit have relied on that decision to hold that whether a non-signatory can compel a party to arbitrate is not a question for an arbitrator. *See O'Connor*, 2023 WL 130522, at *6 (applying *CCC* to conclude that "the issue of whether Defendant has any right as a non-signatory to compel arbitration with Plaintiffs goes to contract formation and must be decided by the Court"); *Moomaw v. GeoSnapShot PTY LTD*, No. 3:23-CV-1321-DWD, 2025 WL 870319, at *3 (S.D. Ill. Mar. 20, 2024) (finding that "whether GeoSnap, a non-signatory to the liability agreements, can compel arbitration is a question of contract formation, which must be decided by the Court"); *see also Al-Nahhas v. Rosebud Lending LZO*, No. 22-CV-750, 2023 WL 5509320, at *8 (N.D. Ill. Aug. 25, 2023), *aff'd sub nom. Al-Nahhas v. 777 Partners LLC*, 129 F.4th 418 (7th Cir. 2025); *Angelilli v. Activision Blizzard, Inc.*, No. 23-CV-16566, 2025 WL 524276, at *2 (N.D. Ill. Feb. 18, 2025); *Kashkeesh v. Microsoft Corp.*, 679 F. Supp. 3d

11

731, 735 n.3 (N.D. Ill. 2023); *Giron v. Subaru of America, Inc.*, 2022 WL 17130869 (N.D. Ill. Nov. 21, 2022).[7]

This Court likewise takes its cue from *CCC* and holds that whether defendants as non-signatories to the Anchor Protocol's terms of service can compel arbitration with plaintiffs is a question for it to decide. As the Fifth Circuit persuasively reasoned in *Newman*, "deciding enforceability between the parties and an arbitration agreement's existence are two sides of the same coin" because "[w]hen a court decides whether an arbitration agreement exists, it necessarily decides its enforceability between parties." 23 F.4th at 398; *see also O'Connor*, 2023 WL 130522, at *6 ("The question of whether [a non-signatory] can enforce the arbitration provision in a contract to which it is not a party is not different from the question of whether an agreement to arbitrate exists between the plaintiff and [a non-signatory].") (quoting *Giron*, 2022 WL 17130869, at *4). Moreover, an "arbitrator cannot resolve any issues until the court has ascertained that there is an actual agreement" between the parties. *K.F.C. v. Snap Inc.*, 29 F.4th 835, 837 (7th Cir. 2022). Here, because there is no binding agreement between plaintiffs and defendants, "the breadth of a delegation is irrelevant." *Id.*; *see also Azuz v. Accucom Corp.*, No. 21-CV-1182, 2023 WL 2525486,

---

[7] As defendants accurately point out, other district courts in this Circuit have concluded differently. *See Matricciani v. Am. Homeowner Pres., Inc.*, 718 F. Supp. 3d 825, 839 (N.D. Ill. 2024); *Coons v. Yum! Brands, Inc.*, 672 F. Supp. 3d 626, 635 (S.D. Ill. 2023); *Reidt v. Advanced Mktg. & Processing, Inc.*, 2023 WL 8469772, at *2–*3 (W.D. Wis. Dec. 7, 2023). However, these decisions did not cite *CCC* nor consider how *CCC* bears on the issue of who decides whether a non-signatory to an agreement can compel a party to arbitrate. This Court's decision in *Woodard v. SmartMatch Ins. Agency, LLC*, No. 23 CV 5246, 2024 WL 4252803 (N.D. Ill. Sept. 20, 2024), is also not instructive, notwithstanding plaintiffs' efforts to find support in it. The Court did not cite *CCC* there, but *Woodard* involved a factual dispute over whether a plaintiff ever actually agreed to arbitrate—not whether a non-signatory could compel arbitration based on equitable principles like estoppel. *See id.* at *2. *CCC* was therefore not relevant to that dispute.

12

at *6 (N.D. Ill. Mar. 15, 2023) ("The arbitrator can't decide *anything* unless the parties have agreed to arbitrate *something*. There is no chicken-and-the-egg problem when it comes to arbitration: an agreement to arbitrate must come before the question of arbitrability.").

For these reasons, the Court will decide whether defendants, as non-signatories, can compel plaintiffs to arbitrate. It turns to that question next.

### B. State-Law Equitable Estoppel Principles Apply.

The parties dispute whether the Court should apply federal or state common law principles in deciding whether non-signatory defendants can compel plaintiffs to arbitrate. Defendants say the Court should look to federal common law principles, *see* [82] at 21, while plaintiffs contend that state law principles apply under binding Supreme Court and Seventh Circuit precedent, *see* [84] at 13.

Plaintiffs have the better argument. The Seventh Circuit has said repeatedly that, in the arbitration context, courts "must apply traditional state promissory estoppel principles to decide whether a non-party should be bound by the terms of another's contract." *Warciak v. Subway Restaurants, Inc.*, 880 F.3d 870, 872 (7th Cir. 2018) (citing *Scheurer v. Fromm Fam. Foods LLC*, 863 F.3d 748, 752 (7th Cir. 2017)); *see also Sosa v. Onfido, Inc.*, 8 F.4th 631, 637 (7th Cir. 2021) (reciting the "fundamental principle" that a "nonparty's right to enforce an arbitration agreement is governed by state law"); *Credit One Bank*, 885 F.3d at 1063 n.14 ("[T]he question whether a party is equitably estopped from denying the application of an arbitration

13

clause is a question of state contract law."). The Seventh Circuit has never limited this broad rule to arbitration provisions between domestic parties only.

Citing *Certain Underwriters at Lloyd's London v. Argonaut Ins. Co.*, 500 F.3d 571 (7th Cir. 2007), defendants maintain that the outcome should be different for agreements that fall under the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("the Convention"). [91] at 10–11. *Certain Underwriters* involved an arbitration agreement that, both parties agreed, fell under the auspices of the Convention and that contained no choice-of-law provision. 500 F.3d at 577. In those circumstances, the appeals court had to decide whether a state-specific exception should apply to extend an otherwise "clear contractual deadline[]" for appointing an arbitrator. *Id.* at 581; *see also id.* at 573–74. *Certain Underwriters* concluded it should not, holding that "the substantial federal interests in uniform interpretation of agreements under the Convention" justified applying a uniform federal rule of decision. *Id.* at 581; *see also id.* at 579 ("We conclude that the Convention and its implementing federal legislation express a clear federal interest in uniform rules by which agreements to arbitrate will be enforced.").

*Certain Underwriters* does not change the outcome here. Unlike the situation in *Certain Underwriters*, the parties here do not agree that their dispute is arbitrable, let alone that any agreement to arbitrate is governed by the Convention. Defendants contend the agreement falls under the Convention because TFL is not a United States citizen. [82] at 21 & n.15. Yet TFL is not a party here—*this* dispute is among domestic parties, *see* [60] at ¶¶ 12–19, so it is not at all clear that the Convention would apply.

14

Compared to *Certain Underwriters*, this dispute, as it stands, is domestic in nature. *Cf. Certain Underwriters*, 500 F.3d at 581, n.9 (rejecting defendant's suggestion that the court "treat a case falling within the Convention as we would treat any domestic case under the FAA"). Moreover, it would put the cart before the horse to apply federal common law based on a contract that plaintiffs say they never intended to enter with defendants. Whereas *Certain Underwriters* addressed which law should apply to interpret the substantive terms of an agreement where everyone agreed the dispute was arbitrable, 500 F.3d at 577, here the Court is dealing with the threshold inquiry of whether defendants can compel plaintiffs to arbitrate under the agreement in the first place. *See Outokumpu Stainless USA, LLC v. Coverteam SAS*, No. 17-10944, 2022 WL 2643936, at \*5–\*6 (11th Cir. July 8, 2022) (Tjoflat, J., concurring) (distinguishing between the substantive arbitration issues for which a choice-of-law provision applies and "the threshold inquiry of arbitrability").

Even if there were a uniquely federal interest at play here, federal common law would only apply where "a significant conflict exists between an identifiable federal policy or interest and the operation of state law, or the application of state law would frustrate specific objectives of federal legislation." *Certain Underwriters*, 500 F.3d at 579 (cleaned up) (quoting *Boyle v. United Techs. Corp.*, 487 U.S. 500, 507 (1988)); *see also id.* (stating that a uniquely federal interest "merely establishes a necessary, not a sufficient, condition for the displacement of state law") (quoting *Boyle*, 487 U.S. at 507). This condition was met in *Certain Underwriters* because applying state law to extend arbitration deadlines on state and federal holidays

15

"would frustrate one of the primary objectives of the United States in becoming a signatory to the Convention: securing uniform standards by which agreements to arbitrate international disputes are governed." *Id.* at 580. In Illinois, for example, the deadline would extend on Casimir Pulaski Day, whereas in Hawaii the deadline would extend on Prince Jonah Kuhio Kalanianaole Day and King Kamehameha I Day. *See id.* at 580 n.8. Here, by contrast, defendants have not identified any similar conflict among state equitable-estoppel principles that would promote non-uniform results when applying state law.

At bottom, without a clearer instruction from the Seventh Circuit to do so, the Court will not depart from the "fundamental principle" that a "nonparty's right to enforce an arbitration agreement is governed by state law." *Sosa*, 8 F.4th at 637; *but see Patterson*, 710 F. Supp. 3d at 709; *Outokumpu*, 2022 WL 2643936, at *5–*6 (Tjoflat, J., concurring). In the Court's estimation, *Certain Underwriters* includes no such directive.

That leads to the next question—which state's law applies? Plaintiffs argue that Illinois law applies based on the most-significant-relationship test. [84] at 17. Defendants suggest that Singaporean law governs based on the choice-of-law provision in the Anchor Protocol's terms of service. [91] at 11–12 n.10. Defendants do not offer any other explanation why the Court should rely on Singaporean law, and the Court sees a host of reasons why it shouldn't. First, the language in the terms of service indicates that Singaporean law applies to the arbitral proceedings, but here the parties are still resolving a preliminary dispute over arbitrability. *See* [83-1] at

16

12 (saying that "[t]he applicable law shall be Singapore law" in the course of describing the arbitral proceedings); s*ee also Outokumpu*, 2022 WL 2643936, at \*5–\*6 (declining to apply substantive choice-of-law provision to threshold arbitrability question). And, to the extent the Anchor Protocol's terms of service identify Singaporean law as the governing law across the board, that provision only applies to "any Dispute between you and *us*"—meaning plaintiffs and TFL. *Id.* at 13; *see supra* at n.5; *c.f. Credit One Bank*, 885 F.3d at 1063 n.14 (declining to apply agreement's choice-of-law provision because "choice-of-law clauses in contracts do not apply to non-parties"); *Stromberg Metal Works, Inc. v. Press Mech., Inc.*, 77 F.3d 928, 933 (7th Cir. 1996) (same).

Lastly, even if it were proper to apply Singaporean law, it is defendants' burden—as the party seeking to compel arbitration—to establish that there is an outcome-determinative difference between Illinois and Singaporean law. *See Bridgeview Health Care Ctr., Ltd. v. State Farm Fire & Cas. Co.*, 10 N.E.3d 902, 905 (2014) ("The party seeking the choice-of-law determination bears the burden of demonstrating a conflict."); *see also id.* ("A choice-of-law determination is required only when a difference in law will make a difference in the outcome.") (cleaned up). Defendants have not done so here, so the Court will apply Illinois law.[8] *See Sosa*, 8 F.4th at 634 (district court "properly applied Illinois law" because defendant "never suggested any difference between Illinois and Washington law").

---

[8] In a footnote of their reply brief, defendants "request the opportunity to brief whether Singaporean law would permit them to compel arbitration as non-signatories." [91] at 11–12 n.10. But the proper time to brief this issue was in defendants' motion to compel arbitration (and their subsequently filed reply). The opportunity to explain why Singaporean law would compel a different outcome has passed.

17

**C. Defendants Cannot Compel Arbitration.**

The default rule in Illinois is that a "nonsignatory typically has no right to invoke an arbitration provision contained in that contract." *Sosa*, 8 F.4th at 639. "But there are recognized exceptions to that general rule." *Id.* For example, a non-signatory might invoke an arbitration provision under a third-party beneficiary, agency, or equitable estoppel theory. *Id.*

Defendants do not attempt to show that *any* state's equitable estoppel principles would enable it to compel arbitration as a non-signatory, let alone Illinois'. Instead, they argue that federal common law principles warrant compelling plaintiffs to arbitrate. [82] at 23–24. Their failure to analyze the issue under state law is fatal to their motion to compel because "[t]he party claiming [equitable] estoppel has the burden of proving it by clear and convincing evidence." *Sosa*, 8 F.4th at 641.

Regardless, plaintiffs have demonstrated why defendants cannot rely on Illinois law. To bring a claim for equitable estoppel, a party "must have relied upon the acts or representations of the other and have had no knowledge or convenient means of knowing the facts, and such reliance must have been reasonable." *Id.* (quoting *Ervin v. Nokia, Inc.*, 349 Ill. App. 3d 508, 514 (2004)). Here, like in *Sosa*, defendants have not identified any representation that plaintiffs made to defendants to induce them to rely on the agreement's arbitration provision. *Id.*

Because defendants have not established their right to compel arbitration as non-signatories, this dispute belongs in federal court.

**CONCLUSION**

For the reasons discussed, defendants' motion to compel [82] is denied. By 5/23/25, the parties are directed to enter a joint status report with anticipated next steps in the case, including, if applicable, a proposed briefing schedule on any potential motion to dismiss. [76]. The Court sets a status hearing in this matter on 5/28/25 at 9:30 a.m.

                                                                Georgia N. Alexakis
                                                                United States District Judge

Date: 5/9/25